Argued and submitted December 3, 1985, affirmed January 28, 1986

# THE GOLDEN WRIT OF GOD,
*Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Respondent.*

## (OTC 1897; SC S31518)

713 P2d 605

Jan Arthur Bull, P.C., Salem, filed the brief for appellant and waived oral argument.

James C. Wallace, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

Before Peterson, Chief Justice, and Lent, Linde, Roberts, Carson and Jones, Justices.

JONES, J.

## JONES, J.

Plaintiff, Golden Writ of God, an Oregon nonprofit corporation, appeals from an Oregon Tax Court judgment denying its claim for a real property tax exemption for the tax year 1981-82. 9 OTR 474 (1984). Generally, under Oregon statutes, religious organizations are exempt from property taxes on church assets or property used for church-related activities. Is the Golden Writ of God entitled to tax exemption for its entire property when it claims subjectively to have allocated all the property to religious and charitable uses, or may this court in objective review of the facts decide otherwise?

Plaintiff owns 230 acres of farmland in Marion County and seeks exemption for the entire parcel as a charitable or religious organization under ORS 307.130 and 307.140, and as a school under ORS 307.145. Defendant, Department of Revenue, admits that plaintiff is a nonprofit incorporated religious organization, but denies that plaintiff should receive an exemption under any of the statutes cited above.

After reviewing this case anew upon the record, ORS 305.445, we agree with the factual findings of the tax court pro tempore Judge Edward H. Howell. Judge Howell found that the plaintiff organization originated in Alaska in 1960 with a few members. The group eventually moved to Salem and contacted a realtor who showed them the 230 acres. In 1980, the organization entered into a contract to purchase the property for $469,000. The land had a farm use classification as unzoned farmland and in late 1980 was no longer used as farmland. The property consists of some tillable land previously planted to grass seed, some woodland, a 2,200 square foot home and a barn and corral.

In 1981, between 17 and 22 members, including 11 school-age children, were living in the house. According to the testimony of some of plaintiff's members, the entire 230 acres, plus the buildings and the trees and native plants growing on the property, constituted a long-sought-after "tabernacle" and all the acreage was necessary to accomplish the religious objectives of the organization.

Plaintiff describes its use of the property:

"The Tabernacle is part of plaintiff's religion of a living

faith and is used 24 hours each day. God mandated that He would teach the congregation on the Tabernacle in dream and vision. The 230 acres is used as a living school given by God in nature. The teachings God gave the congregation from 1961 through 1981 are all manifested in the Tabernacle.

"The entire property is used as a church-school-farm. The congregation has done physical work on the Tabernacle for religious, educational and vocational benefit as a part of attuning themselves to oneness with God's Body. The entire property and everything on it is used to teach spiritual, academic and vocational skills and each of the congregation teaches according to how they have been called by God to share their knowledge.

"The Tabernacle is used as an entire, natural classroom to teach the school children about herbs and what God's uses for herbs are. The entire property is used spiritually, educationally and physically, by and with the horses which have the spirit of God's Gallantry in them and are used to carry the congregation on the spiritual pathways back into oneness with God.

"The entire 230 acre parcel is also used by plaintiff in its charitable works, including the gift of free food, a place to stay, clothing, transportation, counseling, assistance in finding employment, teaching, healing, etc. The Tabernacle has God's Divine Magnetism which manifests in a magnetic orb, covers the entire 230 acres, is a protection given by God and provides plaintiff the spiritual-physical means to send forth God's Work being done on the Tabernacle to benefit the entire planet." (Transcript references deleted.)

The primary issue before us is whether plaintiff's property is exempt from real property taxation under ORS 307.130(1) as property "actually and exclusively occupied or used in * * * charitable * * * work," under ORS 307.140(1) as property "used solely for education [and] * * * charitable * * * purposes," or under ORS 307.145(1) as property used exclusively by a religious organization for "educational purposes."

## A.  *The ORS 307.130 and 307.140 exemptions*

■■   Under ORS 307.130(1), only property "actually and exclusively occupied or used in * * * charitable work" is entitled to be exempt from taxation. In *German Apost. Christ. Church v. Dept. of Rev.,* 279 Or 637, 641-42, 569 P2d 596

(1977), this court enunciated a two-pronged test for a property owner to qualify for tax exemption:

"To qualify for a charitable exemption under ORS 307.130, the taxpayer must show first that 'the activity undertaken on the property substantially contributes to the furtherance of the charity's goals.' *YMCA v. Dept. of Rev.*, 268 Or 633, 635, 522 P2d 464 (1974); or, stated another way, that such a use 'is incidental to and reasonably necessary for the accomplishment and fulfillment of the generally recognized functions of such a charitable institution.' *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 36-37, 343 P2d 893 (1959). Secondly, it must be shown that the property was 'exclusively occupied or used' for such a purpose. We have construed this language to require focus upon 'the primary as distinguished from an incidental use.' *Mult. School of Bible, supra.* If, then, the primary use of the property is reasonably necessary for the charitable functions of the taxpayer, an exemption under ORS 307.130 will be allowed."

We then observed in *German Apost. Christ. Church* that ORS 307.140 can be similarly analyzed.

ORS 307.140(1) provides:

"Upon compliance with ORS 307.162, the following property owned or being purchased by religious organizations shall be exempt from taxation:

(1) All houses of public worship and other additional buildings and property used solely for administration, education, literary, benevolent, charitable, entertainment and recreational purposes by religious organizations, the lots on which they are situated, and the pews, slips and furniture therein. However, any part of any house of public worship or other additional buildings or property which is kept or used as a store or shop or for any purpose other than those stated in this section shall be assessed and taxed the same as other taxable property."

The burden is upon the taxpayer to prove that a claim of exemption meets the statutory requirements. The taxpayer must demonstrate that the property claimed to be exempt is reasonably necessary and actually used in a manner required by ORS 307.140 to qualify for an exemption. It is not enough that the taxpayer owns the entire property and conducts activities on portions of the property that would qualify those portions for an exemption. Nor would a parcel qualify if a

taxpayer owns the entire parcel, conducts qualifying activities on some portions and could (or plans to) but does not, conduct qualifying activities on the remaining portions. Finally, a parcel does not qualify for exemption if a taxpayer owns the entire parcel and subjectively dedicates the entire parcel to qualifying activities, but does not actually use the entire parcel for those activities.

To qualify the entire parcel for exemption under ORS 307.140, the taxpayer must actually use the entire parcel primarily for qualifying activities. The criterion is met when the entire parcel is actually used primarily for qualifying activities or when those portions not actually used are reasonably necessary to accommodate the actual qualifying uses that occur on the remainder of the parcel.

Where a taxpayer claims an exemption from *ad valorem* property taxation for a parcel of property, the taxpayer must present facts that prove the actual qualifying use of each and every portion of the property claimed to be exempt before such portions are entitled to exemption. Certain portions of the parcel for which the exemption is claimed may be entitled to exemption while others are not, depending on the actual and primary use of the different portions under consideration. Because the burden is on the taxpayer to prove entitlement to exemption, where the evidence does not demonstrate which portion of the entire parcel is devoted to exempt activities, or reasonably necessary to allow those activities, no partial exemption on that account should be allowed. *See Diocese of Oregon v. Dept. of Rev.,* 5 OTR 126, 129 (1972). In short, if religious organizations want to exempt the whole ball of wax, they must use the whole ball of wax for exempt activities. We are not going to dissect it for them if there is only partial exempt use.

In this case, in an effort to prove use of the entire property, the followers claimed that they saw God every place on the land and they labeled common Oregon vegetation such as elderberry as "God's Reassurance," wild rose as "Father's Blessing," horsetail as "God's Restriction," stinging nettle as "God's Paper," and St. John's Wort as "God's Rescue."

An example of the nature of the evidence offered by the plaintiff includes the following:

"[Question by defense counsel:] * * * [W]ould I see anything other than what looked like an ordinary piece of farm woodland, house and barn and corral[?]

"* * * * *

"[Answer by plaintiff's secretary:] That depends entirely upon whether you are able to see what is spiritual * * *."

"[Question by the court:] You're not going to say those herbs that you have listed there are peculiar to this 230 acres of land and are not — cannot be found in any other similar piece of property in Western Oregon[?]

"* * * * *

"[Answer by plaintiff's minister:] Okay. * * * The * * * species and genus of all those herbs can be found in other places, of course. What makes the distinction is the fact that the herbs on the tabernacle have the presence of God living in them and the ones on the dry land [*i.e.,* land outside plaintiff's property] do not. * * *"

"[Question by the court:] How - do you use a horse in connection with religious purposes?

"[Answer by plaintiff's president:] If it were that as a cowboy you went to your horse and you slapped him on the hind end and said let's giddy-up-go, he might kick you and you'd wind up without a horse to get there. The basic tenet in — in regards to the religious aspect that each has a spirit and as one comes together with that spirit that is the horse then indeed he will pack you as it would be that you will take care of him. It is a reciprocal process by which because of the religious aspect you are able to become one with the horse.

"[Question by the court:] Well * * * horses are not * * * a necessary ingredient to your religious philosophy, are they?

"A Yes, they are.

"Q. Why?

"A. Because it gives us an ability to be able to work with the animals. * * *"

"[Question by defense counsel:] [W]hen * * * the one that's riding your horse — your member — be doing anything differently other than his own subjective feelings as to whether he was communicating with God or the animal than the other rider would be doing?

"[Answer by plaintiff's president:] I suppose that would be as to the opinion of the person observing it.

"Q. Well, can you think of anything that might distinguish the two?

"A. No, I cannot."

While many may question whether this testimony expresses bona fide religious beliefs, we choose not to step into the controversial thicket whether the legislature intended to grant tax exemption to only traditional religious organizations existing when the legislation was enacted or to extend the tax exemption to every religious cult, no matter how unconventional. A sacred horse may be just as sacred to one of these followers as a sacred cow is to a Hindu. We respect the decisions of religious organizations as to the allocation of property to be used within a religious community, but we are not bound by those decisions when objective facts demonstrate nonreligious use of the property. We do note plaintiff's chameleon-like changes in its characterization of its use of the property. On the one hand it claims the property is used exclusively for charitable and religious purposes but, on the other hand, it claims the property is used exclusively for educational purposes. In its efforts to avoid paying taxes, it first classified this same property as "one entire farm unit" on which it used traditional farming practices. Plaintiff later retracted that claim, stating that "we were very young in regards of what the law was" concerning tax liability for farm property. Plaintiff's characterization depended more upon its perception of the law than its actual use of the property.

After reviewing the record in this case, we are not persuaded that the entire parcel of property consisting of buildings and land owned or being purchased by the plaintiff was reasonably necessary for religious or charitable purposes or functions, or for the attainment of plaintiff's religious or charitable objectives.

The farmland with a house and a barn were just that: farmland, a house and a barn. The property was no different from the farms and homes in which millions of Oregonians have meditated and prayed since this state was founded in 1859. The house was primarily used for living quarters for the persons who lived there. Unlike the nuns in the case of *House of Good Shepherd v. Dept. of Rev.,* 300 Or 340, 710 P2d 778 (1985), this organization did not require a semi-cloistered residence for the organization's members as a tenet of the

order. Several members of the plaintiff organization lived in the outlying area and merely visited the premises. Further, some members who did live on the premises did not dedicate themselves to full-time communal living and prayer, but were otherwise secularly employed in the Salem area. Except for a garden, the untilled farmland was otherwise uncultivated and possessed no unusual attributes other than being a nice place to run horses, to study nature and to meditate or pray.

We conclude that although part of the property was used for religious purposes, there was no reasonable necessity for plaintiff to possess the entire land and buildings to fulfill its beliefs. Plaintiff has not presented evidence sufficient to prove that the entire property was essential to its religious practices. In contrast, the plaintiff in *Lewis & Clark College v. Commission,* 3 OTR 429, 432 (1969), submitted detailed objective evidence supporting its claim for exemption of the president's residence under ORS 307.140, which included the number of occasions the residence was used for official college business, the number of guests whose business was directly or indirectly related to the college, and the importance of the residence in attracting and hiring a college president. In *German Apost. Christ. Church v. Dept. of Rev., supra,* 279 Or at 644, this court, after quoting with approval from *Lewis & Clark College,* stated that "[a]n evidentiary foundation of this sort should be made to support a claimed exemption under ORS 307.140."

In this case, the land and buildings were not used exclusively for religious or charitable purposes. Although we find that portions of the property were used for some religious practices, and for some educational pursuits, the property was also used for communal living pursuits unnecessary to attain charitable or religious goals. On this record, the plaintiff was not entitled to a tax exemption under ORS 307.130 or 307.140 for 1981-82.

B. *The ORS 307.145 exemption*

Plaintiff claims that the property was exempt under ORS 307.145(1), which provides:

"If not otherwise exempt by law, the day care facilities, schools, academies and student housing accommodations, owned or being purchased by incorporated eleemosynary institutions or by incorporated religious organizations, used

exclusively by such institutions or organizations for or in immediate connection with educational purposes, are exempt from taxation."

Once again we find from the evidence that neither the land nor the house was used exclusively for educational purposes. As mentioned, the members of the organization did use some parts of the house and land for religious and charitable purposes unrelated to education. Further, the house was used primarily for living quarters and the land was used for riding horses, other recreation, gardening and meditation. Plaintiff is not entitled to an exemption under ORS 307.145.

## C.  *Application of ORS 308.395 and 308.399*

■  The third and final issue is whether the "rollback" provisions of ORS 308.395 or 308.399 (1979) applied to plaintiff's property when plaintiff no longer used the property as a farm on January 1, 1981. The tax court determined that plaintiff should be assessed additional back taxes under ORS 308.399 because the land was disqualified from its former special farm use assessment.

Plaintiff's land had received a special assessment as unzoned farmland under ORS 308.370(2) from 1971 to 1980. In 1980, Marion County enacted a zoning ordinance effective June 18, 1980, that changed the zone where plaintiff's land was located from unzoned to zoned farmland.

Plaintiff argues that the change to zoned farmland triggered ORS 308.395(5) (in effect in 1980 and January 1, 1981), which plaintiff claims would forestall the assessment of additional taxes. *Former* subsection (5) provided:

"Whenever a farm use zone is established as described in subsection (1) of ORS 308.370, and land which is receiving special assessment as farm use land under subsection (2) of ORS 308.370 thereby is included in such zone, *and such land is being used exclusively for farm use,* the county assessor and tax collector shall cancel any potential additional taxes to be collected under this section." (Emphasis added.)

However, regardless of whether the property is unzoned or zoned farmland, it still must be used exclusively as a farm to forestall the assessment of additional taxes under ORS 308.395 or 308.399. *Former* subsection (5) of ORS 308.395 applied only to land "used exclusively for farm use."

On January 1, 1981, plaintiff did not use the property as a farm. The rollback provisions of ORS 308.399 apply to property zoned as farmland, ORS 308.370(1), which is no longer used as farmland. Plaintiff's property, as of January 1, 1981, was zoned as farmland but not used as farmland, so ORS 308.399 applied. Therefore, the tax court properly concluded that "the property was subject to the rollback provisions of ORS 308.399 and the assessor's action in adding additional tax to the land when it was no longer in farm use was correct." 9 OTR at 480.

The Oregon Tax Court is affirmed.