# IN THE OREGON TAX COURT
## REGULAR DIVISION

WASHINGTON COUNTY ASSESSOR,
*Plaintiff,*

*v.*

WEST BEAVERTON CONGREGATION
OF JEHOVAH'S WITNESSES, INC.,
*Defendant.*

(TC 4708)

Jacquilyn Saito-Moore, Washington County Counsel, Hillsboro, filed the motions and argued the cause for Plaintiff (the county).

Randall A. Wiley, Portland, filed the motions and argued the cause for Defendant (taxpayer).

Decision rendered for Plaintiff February 16, 2006.

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

This case comes before the court for decision after trial. Both Plaintiff Washington County Assessor (the county) and Defendant West Beaverton Congregation of Jehovah's Witnesses, Inc. (taxpayer), were represented by counsel.

## II. FACTS

Taxpayer is a religious organization owning property in Washington County. Taxpayer's property consists of a parking lot and two buildings: a house of worship (the Kingdom Hall) and a detached residence, which is approximately 1,000 square feet in size, and includes a garage, living and dining room, kitchen, bedroom, office, and two bathrooms. Since 1976, taxpayer has enjoyed tax exempt status for all its property except the residence, which was not built until 2001. For the 2003-04 tax year, taxpayer sought tax exempt status for the residence under ORS 307.140.[1] The county denied taxpayer's request for exemption.

Before explaining the particular facts of this case, it is helpful to give some background information on the organizational structure of Jehovah's Witnesses. Jehovah's Witnesses worship within congregations, each of which meets within a Kingdom Hall.[2] Each congregation of Jehovah's Witnesses is located within a circuit. Taxpayer, for

---

[1] All references to the Oregon Revised Statutes (ORS) are to the 2003 edition.

[2] Although four congregations share the Kingdom Hall on the property at issue in this case, for clarity the court refers to them collectively as one congregation.

instance, is one of approximately 22 congregations located within Oregon Circuit 6, which stretches from Beaverton to the coast and from Tillamook to Astoria.[3] Congregations are led by Elders and Ministerial Servants, both of whom are volunteers and generally have secular employment. Elders minister to other congregation members and train Ministerial Servants to assume increasing responsibility within the congregation and larger organization of Jehovah's Witnesses.

Higher up in the organizational structure, Jehovah's Witnesses are led by members of the Worldwide Order of Special Full-Time Servants of Jehovah's Witnesses (the Order). Members of the Order take vows of obedience and poverty, eschew secular employment, and dedicate their lives to overseeing and directing the spiritual needs of Jehovah's Witnesses. In return, the Order promises its members housing and a minimal stipend to cover living expenses. There are several types of Order members, including Circuit Overseers and Special Pioneers. Circuit Overseers live within the circuit to which they are assigned and work with congregation leaders to meet the needs of each congregation. Specifically, Circuit Overseers supervise the work of Elders and Ministerial Servants by annually traveling to and spending at least a week with each congregation within the circuit. Circuit Overseers usually stay in the homes of local Jehovah's Witnesses as they travel from congregation to congregation. Substitute Circuit Overseers, who fill in for Circuit Overseers when they are temporarily unable to fulfill their duties, are rarely Order members, but instead are usually secularly employed Jehovah's Witnesses. Regarding Special Pioneers, the only kind relevant to this case are those who are on infirm status. Special Pioneers on infirm status, few in number, are often ex-missionaries. They generally do not travel but rather stay with one congregation and serve that congregation, as well as the circuit and religion as a whole. However, few congregations have a Special Pioneer, whether on infirm status or not, assigned to them.

Taxpayer built the residence at issue in this case so that it could donate its use to the Order, which it did. The

---

[3] Oregon Circuit 6 consisted of 19 congregations during tax year 2003-04 but has since grown.

residence, during the period in question, served and currently serves as a home for David Parsons, a member of the Order, and his wife.[4] Parsons served as a Circuit Overseer in various parts of the country for decades, until his wife became ill and practically bed-ridden. Parsons then retired from the duties of a Circuit Overseer and now devotes substantial time caring for his wife. Although the Order did not require Parsons to live in the residence, it allowed him to do so, and today Parsons serves taxpayer and the Order as an Elder, Substitute Circuit Overseer, and Special Pioneer on infirm status.[5]

To fulfill his religious duties, Parsons spends approximately four to five hours per day on religious activities, including counseling members and religious leaders of the congregation, holding religious meetings, evangelizing, giving religious presentations, mentoring area Circuit Overseers, substituting for area Circuit Overseers when necessary,[6] and helping organize and speaking at religious conventions. Some of those activities are conducted within the residence, including over the telephone,[7] although some are conducted in the Kingdom Hall and at other locations. Counseling, for instance, is often conducted within the residence because the Kingdom Hall has little private space for that use. Additionally, Parsons's wife leads regular Bible studies and evangelizing activities within the residence. None of Parsons's religious duties, however, require him to take care of the Kingdom Hall or remain nearby to open it up for others. When Parsons's duties carry him away from home, he

---

[4] From 1995 until taxpayer built the residence, Parsons and his wife lived in a trailer on taxpayer's property. One of the reasons taxpayer built the residence was because the county had informed it that the trailer violated local zoning laws. When taxpayer built the residence, it also expanded the Kingdom Hall and installed a surface water drainage system required by the county. All construction was done through the volunteer labor of local Jehovah's Witnesses.

[5] Parsons is one of approximately a dozen Elders at taxpayer's Kingdom Hall, and one of several Substitute Circuit Overseers available to the circuit. He is on infirm status as a Special Pioneer because of the time he spends caring for his wife.

[6] Parsons substituted as a Circuit Overseer only a few times, for a short time on each occasion, during his decade of residence in Oregon. He did not substitute as a Circuit Overseer during the 2003-04 tax year.

[7] Parsons and his wife use most of the residence for religious activities, including the office, the living and dining room, and the bedroom, where Parsons' wife is generally confined by her illness but meets with other Jehovah's Witnesses.

arranges for someone else to look after his wife. Parsons is admired, respected, appreciated, and frequently consulted by members of his congregation, the circuit, and the larger organizational structure of Jehovah's Witnesses. Parsons is of particular use to his congregation and circuit both because of his lifetime of experience and because he is available during the day, unlike most other congregation members who are secularly employed. Parsons also provides a unique benefit to his congregation in that he serves as a sort of Circuit Overseer dedicated just to it, not needing to travel to other congregations throughout the year.

Although taxpayer built the residence with Parsons specifically in mind, testimony showed that the residence would have been built and donated to the Order even if Parsons were not going to live in it.[8] Testimony also showed that the Order indicated to taxpayer that it would use the residence, over which it has discretionary control, as housing for other Order members should Parsons cease to live there. Moreover, even though Parsons is on infirm status, the Order could send him anywhere at any time. Parsons would also have to leave the residence, and the Order, should he ever find that the time spent caring for his wife, or some other cause, rendered him unable to fulfill the duties of his post.

## III. ISSUE

Is taxpayer entitled to a property tax exemption under ORS 307.140 for tax year 2003-04 for the detached residence on its property?

## IV. ANALYSIS

ORS 307.140 governs the ability of religious organizations to obtain an exemption from paying property taxes on property they own or purchase. That statute exempts, among other things not relevant to this case, "[a]ll houses of public worship and other additional buildings and property used

---

[8] The county points to evidence that taxpayer has been disingenuous in its arguments regarding that point. For instance, in a letter attached to taxpayer's application for tax exemption, Franklin Ellis, taxpayer's President, stated that the residence was to serve as a "benevolent care facility" for church officials who are "disabled." At another time, taxpayer claimed that the residence was for a caretaker. However, the weight of the testimony shows that taxpayer was not disingenuous in making those statements, but rather attempted in good faith to describe its situation to county authorities and negotiate the necessary bureaucratic hurdles.

solely for administration, education, literary, benevolent, charitable, entertainment and recreational purposes by religious organizations, the lots on which they are situated, and the pews, slips and furniture therein." The parties agree that the residence at issue in this case is an "additional building" and not a house of worship. The sole question here is whether the residence is used "solely" for "charitable" or other exempt purposes by taxpayer.

In construing statutes, this court follows the methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993) (setting out framework for statutory interpretation). We turn first to the text and context of ORS 307.140. *Id.* at 610-11 (courts must construe text and context first, and if they lead to a clear answer, then the inquiry ends). Context includes interpretations given a statute by decisions of the Supreme Court. *State ex rel Huddleston v. Sawyer*, 324 Or 597, 608, 932 P2d 1145 (1997). In *German Apost. Christ. Church v. Dept. of Rev.*, 279 Or 637, 642, 569 P2d 596 (1977), the Supreme Court construed ORS 307.140 and held that, to qualify for an exemption under that statute, "the primary use of the property must advance charitable purposes or goals of the religious organization." Charitable purposes include the advancement of religion and any other "generally recognized charitable function." *Id.*; *see also House of Good Shepherd v. Dept. of Rev.*, 300 Or 340, 345-47, 710 P2d 778 (1985) (discussing how the advancement of religion is a charitable purpose). In conducting the proper analysis, however, courts must bear in mind that "decisions interpreting ORS 307.130 are of value in discerning the contours of ORS 307.140." *German Apost. Christ. Church*, 279 Or at 641; *see also Archdiocese v. Dept. of Rev.*, 266 Or 419, 513 P2d 1137 (1973) (holding exempt under ORS 307.130, which relates to other charitable institutions, a building that was used as an office for a religious official and religious court, and a printing press for a religious publication).

For organizations seeking tax exemption for their property, the Supreme Court has required that "if the charitable use is the advancement of religion, then such use must be primarily for the benefit of the church as well as reasonably necessary for the furthering of the religious aims of the

church." *German Apost. Christ. Church*, 279 Or at 642. A parsonage may be exempt under ORS 307.140 if,

> "for example, the continuous presence of a religious leader near the church is needed to attend to the religious needs of the congregation. Such a purpose may be at times inferred if residence in a parsonage is required as a condition of the ministry. It may also be true if lack of alternative housing compels the church to furnish its own residence in order to attract a minister.

> "Once such a necessity is shown, the actual use of the parsonage must be examined. If such use is consistent with the claimed necessity the exemption should be allowed. Moreover, the actual use of the parsonage may be highly relevant in determining its necessity. If the property is substantially used for church functions or rites, entertaining or counseling members of the church and the like, the contention of necessity will be buttressed. Incidental personal benefit to the religious leader of the church will not defeat the exemption, provided that use consistent with a shown necessity is proved.

> "\* \* \* \* \*

> "The requirement of 'used solely' in the statute pertains to the character and not the amount of use. Infrequent use of property may indicate in part that such utilization is not reasonably necessary for the advancement of church aims."

*Id.* at 643, 645 (citation omitted). It is possible that only some parts of an organization's property, or even parts of a single building, are exempt, while other parts are not. ORS 307.140(1); *see also Golden Writ of God v. Dept. of Rev.*, 300 Or 479, 483-87, 713 P2d 605 (1986) (describing rule and holding one parcel exempt and others taxable); *German Apost. Christ. Church*, 279 Or at 644-45 (holding an office exempt and the rest of the residence taxable).

There is no shortage of cases construing ORS 307.130 and ORS 307.140, and an examination of precedent sheds light on how the Supreme Court has applied the two-part test it announced in *German Apost. Christ. Church*. In *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 37, 343 P2d 893 (1959), the court held exempt under ORS 307.130 a residence located on the campus of a religious college because it housed

two college employees, a superintendent (who lived with his wife) and a dining hall supervisor, whose functions were necessary to the college's educational mission and which practically required them to live on campus. As the court stated, "even their convenience, as affected by their use of this residence on the school campus, was associated with the performance of duties [on] behalf of the school which would seem to render it highly expedient that they should reside where they do and not elsewhere." *Id.* In *House of Good Shepherd,* the court held a convent exempt under ORS 307.130 and ORS 307.140 because communal, prayerful living was itself a religious objective and because the nuns who resided in the convent were required to do so by their religion. 300 Or at 342-44.

In *Golden Writ of God,* 300 Or at 484-87, however, the court held taxable under both ORS 307.130 and ORS 307.140 a farm and residence that adherents of the Golden Writ of God believed were a "tabernacle" in which everything was holy. The court noted that the Golden Writ of God did not require adherents to live in the residence or on the farm. *Id.* at 486-87. Indeed, "[s]everal members of the plaintiff organization lived in the outlying area and merely visited the premises. Further, some members who did live on the premises did not dedicate themselves to full-time communal living and prayer, but were otherwise secularly employed in the Salem area." *Id.* at 487.

In *German Apost. Christ. Church,* the court held exempt under ORS 307.140 only part of a building owned by a religious organization. 279 Or at 644-45. The building housed, among other things, a residence for a church official, which included an office and living quarters, as well as guest rooms for visiting officials. *Id.* at 639. The court held exempt the office space, but held taxable the rest of the official's living quarters because "[i]nsufficient evidence was presented as to the necessity of a parsonage including the specific duties of [the official] which require his continuous presence near the house of worship of the church." *Id.* at 644-45. Accordingly, the court held taxable the guest rooms because the evidence of their necessity, which showed that they were used for only one week during the prior year, was insufficient. *Id.* at 645.

Similarly, in *Found. of Human Understanding v. Dept. of Rev.*, 301 Or 254, 722 P2d 1 (1986), the court held some parts of a religious organization's property exempt under ORS 307.140, and others not. The organization's property consisted of three parcels: a church with caretaker's residence, a retreat, and a forested ranch. *Id.* at 256-57. The caretaker's residence was used by a husband and wife who were "available day and night to receive phone calls, counsel people by telephone, protect the church from vandalism and sell books and tapes." *Id.* at 262-63. The court held the church exempt but not the caretaker's residence, because "although the caretakers' presence on the property is no doubt beneficial to the Foundation, it is not essential to the organization that they reside there and not elsewhere. The caretakers are not needed at that location to counsel people by telephone or to open the church when needed." *Id.* at 263. As to the retreat, the court held that it was not exempt because it served as a retreat for religious leaders, not adherents, and thus was not "reasonably necessary to accomplish the objectives of the Foundation." *Id.* at 264. Finally, the court held exempt only that part of the ranch that was not specially assessed for forest uses, because only that portion was devoted to and actually used for religious activities. *Id.* at 266.

This court, too, has resolved many cases involving ORS 307.130 and ORS 307.140. In *Lewis & Clark College v. Commission*, 3 OTR 429 (1969), this court held exempt under ORS 307.130 a college residence because it was necessary to the college's mission and served as the mandatory home of the college's president, as well as housing for college guests and the location for numerous college-related gatherings. In *Roman Catholic Archdiocese v. Dept. of Rev.*, 13 OTR 211, 213 (1995), this court held a rectory exempt under ORS 307.140 because the rectory was the site of numerous church functions and because canon law required the priest, who took a vow of obedience, to live in the rectory next to the church and "so he may be available at all times to attend to the needs of the parish."

Finally, in *Washington County v. Dept. of Rev.*, 11 OTR 251, 253 (1989), in what it termed a "close question," this court held taxable under ORS 307.140 a parsonage in

which a pastor and his family lived, as they were required to do by the pastor's religion. One room in the house, the study, was stipulated as exempt. *Id.* at 252. Similarly, the rest of the house was regularly and frequently used for religious activities. *Id.* at 252-54. However, the court held that "the primary use of the property is as a residence. It appears to the court that the use of the property to accomplish religious purposes is only incidental or secondary to the primary purpose of providing a residence for the pastor and his family." *Id.* at 254.

■    Some generalizations can be inferred from the above discussed precedent. Regarding the first prong of the *German Apost. Christ. Church* test, that a religious use of property be "primarily for the benefit of the church," it can be said that those cases holding property exempt involved situations in which the property was used primarily or essentially for religious objectives, with only incidental benefit to the persons using the property. *See House of Good Shepherd*, 300 Or at 343-44 (holding convent exempt where communal, prayerful living was itself a religious objective). Where instead the use was primarily for the convenience of a religious official, and the benefits to the church were incidental, the property was held taxable. *See Washington County*, 11 OTR at 254 (holding parsonage taxable despite frequent religious use and requirement that parson live there because the primary purpose of the residence was to house the parson and his family).

■■    Regarding the second prong of the *German Apost. Christ. Church* test, that a religious use of property be "reasonably necessary for the furthering of the religious aims of the church," it can be said that the cases fall into two categories: those cases involving residences and those not involving residences. As to the latter cases, so long as the use of the property related primarily to church business, the property was held exempt. *See Found. of Human Understanding*, 301 Or at 266 (holding exempt portions of a ranch devoted to and actually used for religious purposes).[9] As to the former cases,

---

[9] Similarly, those parts of a residence which are devoted to church use have been held exempt. *See German Apost. Christ. Church*, 279 Or at 644 (holding office exempt where the rest of the residence was not); *Washington County*, 11 OTR at 252 (same).

it can be said that residences have been held exempt only when two requirements are met. First, the official living in the residence must be required to live there by either church doctrine or practical necessity. *See House of Good Shepherd,* 300 Or at 343 (nuns required by church to live in convent); *Roman Catholic Archdiocese,* 13 OTR at 213 (priest required by church to live in rectory); *Lewis & Clark College,* 3 OTR at 431 (college president required by college to live in residence); *Mult. School of Bible,* 218 Or at 23 (superintendent and dining hall supervisor required by expediency to live in residence). Where there was no such requirement, the property was held taxable. *See Golden Writ of God,* 300 Or at 486-87 (adherents of religion not required to live in residence or on farm). Second, the proximity of the residence to the house of worship must be necessary to further religious objectives. *See Mult. School of Bible,* 218 Or at 23 (residence required to be on campus so superintendent and dining hall supervisor could fulfill their duties); *House of Good Shepherd,* 300 Or at 343-44 (communal, prayerful life required nuns to live together in convent); *Lewis & Clark College,* 3 OTR at 432 (president's house required to be near campus so college could stay competitive); *Roman Catholic Archdiocese,* 13 OTR at 213 (rectory required to be near church so priest could remain "available at all times to attend to the needs of the parish"). Where the proximity of the residence to the house of worship was not essential, but rather merely beneficial, to the advancement of religious purposes, the residence was held taxable. *See German Apost. Christ. Church,* 279 Or at 644-45 (parson not required to have "continuous presence near the house of worship" to fulfill his duties); *Found. of Human Understanding,* 301 Or at 263 (caretaker not required to live next to church to prevent vandalism and take phone calls).

In the present matter, the county concedes that the office located within the residence is exempt under ORS 307.140 because it was reasonably necessary and primarily used to advance church purposes. *See German Apost. Christ. Church,* 279 Or at 644 (holding office exempt where the rest of the residence was not); *Washington County,* 11 OTR at 252 (same). However, the county maintains that the rest of the residence is taxable because Parsons is not required by the

Order or by practical necessity to live in the residence; it is not essential that the residence be located near the Kingdom Hall; and the residence was not used primarily for religious objectives, but instead for Parsons' convenience. The county notes that few congregations have Special Pioneers and none are required to; moreover, Elders and Substitute Circuit Overseers are almost always secularly employed citizens who pay property taxes on their homes.[10] The county also argues that there is no connection between the religious work conducted by Parsons and his wife and the residence's location next to the Kingdom Hall.

Taxpayer cites no tenet of its religion or rule of the Order that requires Parsons to live in the residence, nor does taxpayer cite any requirement that Order members, Elders, or anyone for that matter, live near a Kingdom Hall. Instead, taxpayer makes another argument. Taxpayer contends that, because Parsons has taken vows of poverty, lifelong service, and obedience to the Order, as did the nuns in *House of Good Shepherd*, 300 Or at 343 (vows of poverty, service, and obedience), and the priest in *Roman Catholic Archdiocese*, 13 OTR at 213 (vows of marriage to church, service, and obedience), and because the Order promises its members housing in return, Parsons must live where the Order sends him, in this case, at the residence that is the subject of this action. Additionally, taxpayer argues that, because Parsons is a Substitute Circuit Overseer assigned to Oregon Circuit 6, he must live within that circuit. Finally, taxpayer contends that because Parsons is an Elder, he must live near the congregation of which he is a member.

Taxpayer is mistaken. First, although the Order required Parsons to live in Oregon Circuit 6, it did not require him to live in the residence, but only allowed him to do so. Second, although the Order owes Parsons an obligation of

---

[10] The county also argues that because it is rare for any congregation to have its own Special Pioneer, on infirm status or not, Parsons is a luxury and not a necessity to his congregation or circuit. That contention is misguided. If a religious official is required by doctrine and practical necessity to live in a residence near a church and the primary use of the residence is to advance religious objectives, then the residence is exempt, regardless whether there are few officials of that type or having those duties, or many. *See German Apost. Christ. Church*, 279 Or at 642 (stating rule for exemption and not requiring that a type of official or duty be common within a particular religion).

housing within the circuit, that housing need not be in the residence, but could instead be in the home of another Jehovah's Witness, in an apartment, or some other place within the circuit. Indeed, Parsons testified that Order members live in all sorts of arrangements. Circuit Overseers, for instance, often stay with local congregants as they travel from congregation to congregation within the circuit. Substitute Circuit Overseers are rarely Order members, but rather are generally secularly employed. Parsons testified that only once before had he heard of a case in which a Substitute Circuit Overseer lived on church property next to a Kingdom Hall. Neither does Parsons' capacity as an Elder in taxpayer's congregation require him to live in the residence; Elders are secularly employed and pay for their own housing. The court concludes that neither church doctrine nor practical necessity requires Parsons to live in the residence.

■ Even if the Order did require Parsons to live within the residence, the court finds that the proximity of the residence to the Kingdom Hall is not necessary to further church objectives, but rather serves to benefit Parsons. Although Parsons devotes substantial time to religious duties, those duties do not require close physical proximity to the Kingdom Hall. Parsons could easily prepare presentations, counsel congregation members, and telephone with church leaders from any other location within Beaverton. *Cf. Roman Catholic Archdiocese*, 13 OTR at 212-13 (describing nexus between priest's duties and location of rectory near church). Accordingly, the court finds that taxpayer does not meet the second prong of the *German Apost. Christ. Church* test, requiring that the use of the property be "reasonably necessary for the furthering of the religious aims of the church." *German Apost. Christ. Church*, 279 Or at 642.

■ The court also finds that taxpayer fails the first prong of the test, that the use "must be primarily for the benefit of the church." *Id.* Parsons' job may be made easier by the residence's location, given his wife's illness, yet that fact only underscores that the primary reason for the residence's location is Parsons' convenience, not that of the congregation. *See Washington County*, 11 OTR at 254 (holding a parsonage taxable where "the use of the property to accomplish religious purposes [was] only incidental or secondary to the primary

purpose of providing a residence for the pastor and his family"). With regard to residences, it is neither the vows of poverty and obedience nor the promise of free housing, nor even substantial religious use, that leads to exemption, but rather the religious and practical requirement of residence in close proximity to a specific house of worship, combined with actual use primarily for the benefit of the religion and not the resident. In close cases, exemptions must be denied. *Washington County*, 11 OTR at 254 (stating that exemption statutes must be strictly and not liberally construed, and that the burden of proving exemption is on taxpayer). Here, as in *Washington County*, the result may seem harsh, *see* 11 OTR at 254; *Roman Catholic Archdiocese*, 13 OTR at 214, yet exemptions are the exception, not the rule, and the court finds this case much more like *German Apost. Christ. Church, Golden Writ of God, Found. of Human Understanding*, and *Washington County*, than *Mult. School of Bible, House of Good Shepherd, Lewis & Clark College*, or *Roman Catholic Archdiocese*.

## V. CONCLUSION

The court concludes that Parsons is not required by church doctrine or practical necessity to live in this or any residence with such close proximity to the Kingdom Hall on taxpayer's property. The court also concludes that the primary use of the residence, except the office within it, is to provide Parsons and his wife with housing, and that the advancement of the religion of Jehovah's Witnesses is only an incidental benefit. Now, therefore,

IT IS DECIDED that taxpayer is not entitled to a property tax exemption under ORS 307.140 for tax year 2003-04 for the detached residence, except for the office, located on its property.