312 December 19, 2016 No. 34

## IN THE OREGON TAX COURT
## REGULAR DIVISION

ST. MARY STAR OF THE SEA
CATHOLIC CHURCH, ASTORIA,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5248)

Plaintiff (taxpayer) appealed from a Magistrate Division decision as to the exemption status of its rectory in Astoria, Oregon. Taxpayer applied for exemption from property tax under ORS 307.140 for the rectory. The county denied that application, questioning whether the use of the rectory, which is located 1.5 miles away from the church, qualified as religious use under ORS 307.140. The magistrate determined that the rectory was not subject to exemption under the statute. Defendant Department of Revenue (the department) argued that the preparation of sermons, materials, decorations, and the like could be done anywhere, and therefore did not demonstrate the reasonable necessity of a rectory near the church. Further, the department argued that there were insufficient meetings conducted in the rectory to support exemption and that the primary—and disqualifying purpose—of the rectory was as a residence. Granting taxpayer's motion and denying the department's cross-motion, the court ruled that because of its religious necessity, as all parts of the rectory were used for religious purposes, and that significant aspects of the parish priest's work required residence in the rectory, the rectory's use advanced taxpayer's religious purpose, and was therefore qualified as exempt.

Oral argument on cross-motions for summary judgment was held August 30, 2016, in the courtroom of the Oregon Tax Court, Salem.

Marc K. Sellers, Schwabe, Williamson & Wyatt PC, Portland, filed the motion and argued the cause for Plaintiff (taxpayer).

Daniel Paul, Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue (the department).

Decision for Plaintiff rendered December 19, 2016.

**HENRY C. BREITHAUPT, Judge.**

## I.    INTRODUCTION

This case is before the court on cross-motions for summary judgment. Plaintiff St. Mary Star of the Sea Catholic Church, Astoria, Oregon (taxpayer or the parish) appeals from a Magistrate Division decision. The magistrate upheld a denial by Clatsop County Assessor (the county) of taxpayer's application for property tax exemption for tax year 2014-15 for property of religious organizations. *See* ORS 307.140.[1] Defendant Department of Revenue (the department) argued this case for the county. *See* ORS 305.501(5)(c).

## II.    FACTS

Many facts in this case are stipulated. However, taxpayer also introduced uncontested exhibits and declarations.[2] The department introduced no additional evidence.

Understanding the general background affords the appropriate context for this order. Taxpayer is a parish of the Roman Catholic Church. Taxpayer is part of the ecclesiastical entity the Archdiocese of Portland, Oregon. Taxpayer is the only Roman Catholic parish in Astoria. Taxpayer has one priest assigned to it, Father John Tran. He serves as the pastor of the parish, and serves the entire parish area.

Taxpayer "serves the religious needs of *** an area of approximately 360 square miles, from the Columbia River on the North to Gearhart on the South, from the Clatsop County boundary on the East to the Pacific Ocean on the West." Within that area, parishioners attend either a church in Astoria or a mission in Hammond.

The church is operated by taxpayer. The mission "has its own facilities for worship, religious education, social activities, and service to the community" but it does not

---

[1]  The court's references to the Oregon Revised Statutes (ORS) are to the 2013 edition.

[2]  The declarations provided by taxpayer are from: Monsignor Patrick S. Brennan, Judicial Vicar for the Archdiocese of Portland; Father Todd Molinari, Vicar for Clergy for the Archdiocese of Portland; Mike Wallis, member of taxpayer's Parish Finance Council; and Marc Sellers, attorney for taxpayer.

have its own priest.[3] Accordingly, the mission is "basically an outpost with a canonical dependence" on the church.

The Roman Catholic Church operates under the concept of "sustenance," under which the parish must provide for the "basic necessities" of its priest. Those "basic necessities" include housing. Priests receive only "modest" compensation for their services to a parish.

According to Canon Law, a pastor assigned to a parish must live "near" the parish church in a rectory. According to archdiocesan policy, the rectory is "near" the church when it is "within parish boundaries, to enable the pastor to be available, as necessary, to perform priestly duties and best serve the parish and its parishioners in accordance with Canon Law and the teachings of the church." The rectory must also "be within a reasonable distance to the church facilities, and provide a place for the priest to sleep, cook his meals, do his laundry, and have an area for study."

"The rectory is essential to the fulfillment of the priest's ministerial duties in providing a locus for the prayer and reflection that ground his priestly life." Housing is adequate under archdiocesan policy if the rectory includes: "a bedroom, study and bath for each priest; a kitchen, laundry, living room, dining room and guest room; and a garage and storage." The archdiocese recommends that the rectory have space available for an assistant priest, if assigned, and for seminarians studying for the priesthood given a temporary assignment at the rectory. There should also be space in the rectory for visiting priests.

The rectory is located on property in Astoria owned by taxpayer. The property "consists of a two-story house, and includes three bedrooms, 2 1/2 bathrooms, a living room, dining room, kitchen, family room and a bonus room." The rectory is located approximately 1.5 miles from the church.

The parish priest lives in the rectory as his full-time residence. No portion of the rectory is used for the housing of his family. He sleeps in the master bedroom. The second and

---

[3] It is not clear from the record whether the mission is operated or maintained by taxpayer. However, that fact is not relevant to this order.

third bedrooms are reserved as accommodations for guests, including visiting priests and other religious visitors. The living room serves as his main study and home office. The family room is used as additional office space. The bonus room is used for "working on and storing seasonal liturgical decorations, ministry books and pamphlets."

The rectory has "continuously" been used for religious purposes. Those purposes include the "preparation of sermons, preparation of materials and decorations for children's Masses, and planning liturgical services and celebrations of the Church." In addition, the parish priest hosts religious officials and meetings at the rectory as part of his religious obligations to Domus Dei[4] and taxpayer's religious obligations to the Vicariate.[5] At times, the rectory is also used for church-related meetings. No secular use of the rectory has been made; it has been used "consistently," "continuously," and "exclusively" for religious purposes.

However, the parish priest does not conduct all of his parish duties at the rectory. He has an office in a building next to the church. In addition, the parish has offices next to the church where the parish priest "holds most of his meetings including staff meetings, liturgical meetings, and pastoral council meetings." Most meetings with parishioners occur at facilities located next to the church, rather than at the rectory.

Taxpayer applied for exemption from property tax under ORS 307.140 for the rectory. The county denied that application. The county questioned whether the use of the rectory, which is located 1.5 miles away from the church, qualified as religious use under ORS 307.140.[6]

---

[4] Domus Dei, which translates to "House of God," is a religious community "comprised of priests, monks, and 'brothers' who have just entered the religious order." The parish priest's Domus Dei community is located in Washougal, Washington.

[5] A 'Vicariate' is an ecclesiastical grouping of regional parishes."

[6] Taxpayer introduced evidence to show that the county acted arbitrarily in denying exemption. However, this court reviews the question of exemption *de novo.* ORS 305.425(1). The county's actions are not relevant to this order. Taxpayer's arguments under *Freitag v. Dept. of Rev.*, 19 OTR 144 (2006), are misplaced. That case concerned review of a magistrate's dismissal of a case under a procedural rule, a question not presented here.

It appears that the county had not similarly denied taxpayer's previous rectory, which was located on the same city block as the church. Taxpayer relinquished that rectory due to various and significant issues that were costly to maintain, such as "drainage, mold, plumbing, electrical and water leakage problems." The prior rectory also did not comply with the rectory guidelines established by the archdiocese. Accordingly, taxpayer sought out a new rectory.

Many of the buildings closest to the church are located on the Historic Register (and too expensive), or in a state of prohibitive disrepair similar to the prior rectory. Despite the 1.5 mile distance from the church, taxpayer selected and purchased the rectory at issue. The rationale underlying the selection and purchase of the rectory is explained by Mike Wallis, a member of the parish's finance council:

> "[T]he parish Finance Council was mindful in its deliberations and evaluations of the fact that it is located a mile and a half from the church property. However, in view of that fact, the parish Finance Council and the parish priest determined that this was not an inconvenient or impractical distance and that the condition of the property, coupled with its suitability for use as a rectory and its price and newer construction, made the acquisition of this property a sound use of parish funds. The parish would not have to expend funds to bring this property up to Archdiocesan guidelines or make extensive repairs. This property also presented an opportunity for future appreciation in value, versus the existing situation of continually putting money into a bottomless pit for continual repairs. It was also a good move from a cash flow standpoint as well, as our monthly mortgage payment would be approximately $300

---

Taxpayer further argues that, if the county assessor's actions are not relevant for purposes of this ruling, then an assessor's "actions towards taxpayers are never subject to scrutiny and need never accord due process of law." Taxpayer's concerns are alleviated by several checks on county conduct. First, the department may exercise its supervisory review function. ORS 306.115. Second, taxpayer is accorded due process in this court, where the county assessor's actions are subject to review and generally accorded *no presumption of correctness*. *J. R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 377, 494 P2d 854 (1972). Finally, the actions of the county assessor may serve as a basis for an award of attorney fees upon a taxpayer's successful challenge of the assessment. ORS 305.490; Tax Court Rule (TCR) 68. The county's alleged misconduct is not relevant for purposes of this order.

less than our current monthly rent payment being made (not considering any continual repair per month costs)."

Taxpayer appealed the county's denial to the Magistrate Division of the Tax Court. The magistrate determined that the rectory was not subject to exemption under ORS 307.140. Taxpayer appealed that decision to this court.

### III.   ISSUE

Is taxpayer entitled to a property tax exemption for the rectory under ORS 307.140?

### IV.   ANALYSIS

ORS 307.140 provides for an exemption from ad valorem property taxation for certain property of religious organizations. That property includes:

"All houses of public worship and other additional buildings and property used solely for administration, education, literary, benevolent, charitable, entertainment and recreational purposes by religious organizations, the lots on which they are situated, and the pews, slips and furniture therein."

ORS 307.140(1).

The rectory is not a house of public worship. Accordingly, it can only be exempt from taxation if it qualifies as an "other additional building[] *** used solely for administration, education, literary, benevolent, charitable, entertainment and recreational purposes" by taxpayer.

In deciding whether this rectory qualifies for exemption, this court is mindful that exemption statutes are strictly construed. *German Apost. Christ. Church v. Dept. of Rev.* [hereinafter *German Apostolic*], 279 Or 637, 640, 569 P2d 596 (1977). However, where legislative intent can be determined, this court will give effect to that intent. *See North Harbour Corp. v. Dept. of Rev.*, 16 OTR 91, 95 (2002) (explaining that the strict construction rule "serves as a tie breaker, in favor of taxation, where no legislative intent can be discerned"). "In close cases, exemptions must be denied." *Washington Co. Assessor II v. Jehovah's*

*Witnesses* [hereinafter *Jehovah's Witnesses*], 18 OTR 409, 422 (2006). "The burden is upon the taxpayer to prove that a claim of exemption meets the statutory requirements." *Golden Writ of God v. Dept. of Rev.*, 300 Or 479, 483, 713 P2d 605 (1986).

A.   *The* German Apostolic *Test*

To determine whether property is exempt under ORS 307.140, the Supreme Court in *German Apostolic* established a two-part test. *See* 279 Or at 642.

First, the use of the property must be "primarily for the benefit of the church." *Id.* The department does not appear to contest that this test is met in this case. In any event, it has introduced no evidence disputing that the rectory has been used "consistently," "continuously," and "exclusively" for taxpayer's religious purposes. Given that evidence, and the record as a whole, the court finds that the use of the rectory is primarily for taxpayer's benefit.

As to the second part, the *German Apostolic* court determined that the use of the property must be "reasonably necessary for the furthering of the religious aims of the church." 279 Or at 642. Once necessity is shown, the actual use of the rectory must be examined to ensure it conforms to the claimed necessity. *Id.* at 643.

When property is being used at least in part as a residence, as the rectory is here, additional care must be taken to ensure that the residence is reasonably necessary to the religious purposes of the taxpayer. While the legislature has intended to exempt certain religious property, it "has not seen fit to expressly exempt parsonages." *Washington County v. Dept. of Rev.*, 11 OTR 251, 254 (1989).

B.   *Part Two of the* German Apostolic *Test as Applied to Residences*

With respect to residences used by religious organizations for religious purposes, this court has identified two requirements needed to satisfy the second part of the *German Apostolic* test. *See Jehovah's Witnesses*, 18 OTR at 419. "First, the official living in the residence must be required to live there by either church doctrine or practical

necessity."[7] *Id.* (citations omitted). "Second, the proximity of the residence to the house of worship must be necessary to further religious objectives." *Id.* (citations omitted).

Recall, however, that once necessity is shown, the actual use must be examined to ensure it conforms to the claimed necessity. *German Apostolic*, 279 Or at 643.

### 1. *Parish priest is required by church doctrine to live in the rectory*

As to the first requirement of part two of the *German Apostolic* test, it is uncontested that the parish priest is required by Canon Law to live in the rectory near the church. Taxpayer must provide for the sustenance, or basic necessities, of the parish priest, including housing. That housing, the rectory, must be within a reasonable distance to the church facilities. This court finds the first requirement described in *Jehovah's Witnesses* to be satisfied.

### 2. *Reasonable necessity of the rectory*

As to the second requirement of part two of the *German Apostolic* test, the evidence shows that the rectory and its proximity to the church is reasonably necessary to the advancement of taxpayer's religious purposes. Taxpayer requires a parish priest to tend to the needs of the parish. Under Canon Law, taxpayer is required to provide a rectory for the use of the parish priest. The rectory must be near the church so that the parish priest can attend to the needs of the parish. The rectory also provides the parish priest a "locus for the prayer and reflection that ground his priestly life." It also provides a place for other religious officials to stay during visits or assignments relating to this parish and the larger church. No secular use of the rectory has been made, and it is not used to house the parish priest's family.[8]

---

[7] There is an apparent conflict in the statement of this requirement in *Jehovah's Witnesses*. In a footnote, this court stated that a religious official must be "required by doctrine *and* practical necessity to live in a residence near a church." 18 OTR at 420 n 10. However, in the body of the opinion, this court only required a showing of either "church doctrine *or* practical necessity." *Id.* at 419. To clarify, only one or the other is required, not both.

[8] Of course, even if the parish priest's family did reside in the rectory, it would not necessarily prevent taxpayer from claiming exemption. *See Roman Catholic Archdiocese v. Dept. of Rev.*, 13 OTR 211, 214 (1995) ("A parsonage of a

The rectory and the housing of the parish priest are reasonably necessary to taxpayer's religious purpose.

The facts of this case are nearly identical to those in *Roman Catholic Archdiocese v. Dept. of Rev.*, 13 OTR 211 (1995), where this court granted exemption for a rectory:

> "One bedroom is used by the priest, one serves as a guest room for visiting priests or people assisting in church activities, and a third is used for storage. The priest uses the rectory to study and write sermons, prepare classes and workshops for the parish, conduct individual and marriage counseling, hear confessions, and make and receive phone calls. The rectory is also used for small meetings of parish groups and the housing of visiting priests. The parish priest performs administrative duties in the nearby parish center, but most of his pastoral work is performed in the rectory. Parishioners use the rectory bathrooms and kitchen in conjunction with their meetings and other church uses. No one else resides at the rectory."

13 OTR at 212.

One possible distinction in this case is that Father Tran conducted most "meetings" outside the rectory, whereas the priest in *Roman Catholic Archdiocese* performed most of his "pastoral work" in the rectory.[9] However, nothing in the case law indicates that a pastor or priest must perform every duty in the rectory. Regardless, with respect to "meetings," the rectory was required so that the parish priest could host meetings with visiting religious officials and members of Domus Dei.

### 3. *Actual use of the rectory*

Because taxpayer has demonstrated reasonable necessity, this court must examine the actual use of the

---

minister with a family which meets the tests of *German Apost. Christ. Church* can qualify for exemption.").

[9] In its briefing, the department attempts to distinguish *Roman Catholic Archdiocese* on the basis that the rectory there was on church grounds, whereas taxpayer's rectory here is 1.5 miles away from the church. However, at oral argument, the department stated that the proximity of the building was not determinative, and that it would still dispute exemption even if the rectory was on church grounds. This court does not find such a distance to be a disqualifying factor. This is particularly true when taxpayer had legitimate reasons for selecting the location of the rectory, and taxpayer determined that the distance would not undermine the purpose of the rectory.

rectory to ensure that it is consistent with the claimed necessity. It may be true that the priest in this case conducts many of his meetings outside the rectory, but the record is clear that he prepares sermons, materials, decorations, and liturgical services in the rectory. *See Roman Catholic Archdiocese*, 13 OTR at 212. Moreover, the priest requires and uses the rectory as "a locus for the prayer and reflection that ground his priestly life." *See House of Good Shepherd v. Dept. of Rev.*, 300 Or 340, 344 (1985) (holding that the communal living space and semi-cloistered life of a convent of nuns is exempt because "[t]he daily discipline of a religious life is a form of practicing the faith"). Finally, the evidence shows that the rectory was used "consistently," "continuously," and "exclusively" for religious purposes. Therefore, while *some* duties of the *parish priest* are conducted outside the rectory, the *rectory* is continuously used for religious purposes.

## C. *The Department's Arguments*

The department argues that the preparation of sermons, materials, decorations, and the like can be done anywhere, and therefore do not demonstrate the reasonable necessity of a rectory near the church. Further, the department argues that there were insufficient meetings conducted in the rectory to support exemption. Therefore, argues the department, the primary—and disqualifying purpose—of the rectory is a residence. In support, the department relies upon this court's decisions in *Washington County v. Dept. of Rev.*, 11 OTR 251 (1989), and *Jehovah's Witnesses*.

### 1.  Washington County v. Dept. of Rev.

In *Washington County*, in what it termed a "close question," this court denied an exemption for a parsonage. 11 OTR at 253-54. The property at issue was a single-family residence. *Id.* at 251. It was used as a residence for the pastor and his family. *Id.* at 252. Outside its use as a residence, some portions of the parsonage were frequently used for church purposes. *Id.* at 252, 254. Notably, the pastor was required by religious doctrine to live in the parsonage. *Id.* at 254. However, this court found that the primary purpose of the parsonage was its use as a residence, and denied exemption. *Id.*

Questions of exemption for religious property are necessarily dependent on the facts of each case. *See Roman Catholic Archdiocese*, 13 OTR at 214 (noting that decisions are based on the evidence submitted in each case). While this court in *Washington County* saw the question of exemption for the parsonage as a "close question," the facts in this case are more like *Roman Catholic Archdiocese*, where exemption was granted, than *Washington County*.[10]

Unlike in *Washington County*, no portion of the rectory in this case was used for the parish priest's family. In addition, all parts of the rectory were used for religious purposes. Further, unlike in *Washington County*, there is evidence in this case that the church benefited from having the parish priest nearby to serve the parish. Also unlike in *Washington County*, taxpayer here introduced evidence that the parish priest needed a quiet place and a locus to ground his spiritual life, and that the rectory was designed to facilitate regular religious visitors. Both of these uses advance taxpayer's religious purpose. Taxpayer's rectory is materially unlike the parsonage denied exemption in *Washington County*.

2.   Jehovah's Witnesses *case*

In *Jehovah's Witnesses*, this court denied an exemption for a residence used by a religious official and located near the order's house of worship. 18 OTR at 411-13, 422. In the tax year at question, the religious official served four to five hours a day in religious pursuits, but spent "substantial time caring for his wife." *Id.* at 412. The duties of the religious official were

> "counseling members and religious leaders of the congregation, holding religious meetings, evangelizing, giving religious presentations, mentoring area Circuit Overseers, substituting for area Circuit Overseers when necessary, and helping organize and speaking at religious conventions.

---

[10] This court in *Roman Catholic Archdiocese* addressed the existence of *Washington County* in its decision, and nevertheless determined that the rectory was subject to exemption. *Roman Catholic Archdiocese*, 13 OTR at 214. This necessarily means that this court in *Roman Catholic Archdiocese* considered the argument that the rectory's primary purpose was its use as a residence, and rejected it.

Some of those activities are conducted within the residence, including over the telephone, although some are conducted in the Kingdom Hall and at other locations."

*Id.*

None of the official's duties "require[d] him to take care of the Kingdom Hall or remain nearby to open it up for others." *Id.* In addition, he was not required to live in the residence or near the house of worship, but instead was *allowed* to do so. *Id.* The order was obliged to house him, but "that housing need not be in the residence, but could instead be in the home of another Jehovah's Witness, in an apartment, or some other place within the circuit." *Id.* at 420-21.

The taxpayer's only remaining argument in support of exemption of the residence in that case was that the religious official had taken "vows of poverty, lifelong service, and obedience to the Order, as did the nuns in *House of Good Shepherd*, *** and the priest in *Roman Catholic Archdiocese*." *Id.* at 420. However, this court determined that "it is neither the vows of poverty and obedience nor the promise of free housing, nor even substantial religious use, that leads to exemption, but rather the religious and practical requirement of residence in close proximity to a specific house of worship, combined with actual use primarily for the benefit of the religion and not the resident." *Id.* at 422. Stated differently, proximity of the residence is necessary, but not sufficient. The residence, and its proximity to the church, must be necessary.

Moreover, this court stated that the official "could easily prepare presentations, counsel congregation members, and telephone with church leaders from any other location within Beaverton." *Id.* at 421 (comparing *Roman Catholic Archdiocese*, 13 OTR at 212-13 (describing nexus between priest's duties and location of rectory near church)). This court found that the primary reason for living in the residence was not to further religious objectives, but rather the official's "convenience" in the care of his wife. *Id.* at 421.

The situation in *Jehovah's Witnesses* is not present here. First, the record shows that the parish priest's proximity is for the benefit of the parish. He is consistently available

to tend to their needs.[11] Second, there is nothing to suggest that living in the rectory was for the convenience of the parish priest in the care of his family. Instead, the record shows that the parish priest requires a locus for prayer and reflection, and that the parish requires a rectory for visiting religious officials to stay and meet with the parish priest and the parish. Third, the record does not indicate that there are acceptable religious alternatives to a rectory, such as living with parishioners. The rectory here is entitled to an exemption because of its religious necessity, not simply for its proximity.

The department argues that the "preparation of sermons, preparation of materials and decorations for children's Masses, and planning liturgical services and celebrations of the Church," could occur anywhere, just as this court stated in *Jehovah's Witnesses*. If this was the only responsibility of the parish priest, perhaps exemption would be denied.

However, the priest in *Roman Catholic Archdiocese* also studied in the rectory, and prepared sermons, classes, and workshops for the parish. 13 OTR at 212. It is notable that this court in *Jehovah's Witnesses* contrasted *Roman Catholic Archdiocese*—a case factually on point—as an example where the proximity of the religious official *was required* for religious purposes. *See* 18 OTR at 421. While some aspects of the parish priest's work could arguably occur anywhere, and some did occur elsewhere, this court will not deny exemption on that basis alone when other, significant aspects of the parish priest's work do require residence in the rectory next to the church.

D.   *Rectory is Exempt under ORS 307.140*

Each case turns on its facts. *See Roman Catholic Archdiocese*, 13 OTR at 214. In close cases, this court will deny exemption. *Jehovah's Witnesses*, 18 OTR at 422. The burden in supporting an exemption is on the taxpayer. *Golden Writ of God*, 300 Or at 483. The record shows that this property is primarily used for the religious purposes of

---

[11] The department argues that there is no evidence that the parishioners made use of the parish priest's availability. On this record, that fact is not determinative.

taxpayer and entitled to exemption under ORS 307.140. The parish priest might incidentally benefit from use of the rectory as a residence, but such benefit does not negate exemption. *See Mult. School of Bible v. Mult. Co.*, 218 Or 19, 29, 343 P3d 893 (1959) ("It is the primary as distinguished from an incidental use that determines whether [property] is exempt from taxation."). Taxpayer's rectory is exempt.

## V.   CONCLUSION

This court finds the rectory in this case to be used primarily for the benefit of taxpayer. The record shows that no secular use of the rectory has been made. The rectory is also reasonably necessary for the advancement of the religious purposes of taxpayer. Taxpayer requires a parish priest near the church to attend to the varying needs of the parish. Finally, the actual use of the rectory meets with the claimed necessity. Now, therefore,

IT IS ORDERED that Plaintiff's motion for summary judgment is granted; and

IT IS FURTHER ORDERED that Defendant's motion for summary judgment is denied.