IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax Exemption

ST. MARY STAR OF THE SEA CATHOLIC )
CHURCH, ASTORIA, a Parish of the Roman )
Catholic Church, )
)
        Plaintiff, ) TC-MD 140316C
)
    v. )
)
CLATSOP COUNTY ASSESSOR, )
)
        Defendant. ) **FINAL DECISION**


       This Final Decision incorporates without change the court's Decision, entered

April 20, 2015. The court did not receive a statement of costs and disbursements within 14 days

after its Decision was entered. *See* TCR-MD 16 C(1).

       Plaintiff appeals Defendant's denial of its application for property tax exemption for

property identified as Account 52466 (subject property) for the 2014-15 tax year. A trial was

held on March 17, 2015, in Salem, Oregon. Marc Sellers, attorney, appeared on behalf of

Plaintiff. Father John Tran (Tran) and Father Todd Molinari (Molinari) testified on behalf of

Plaintiff. John Solheim and Michael Grant appeared on behalf of Defendant. Defendant did not

call any witnesses or put on a case. Plaintiff's Exhibits 1 to 3 were received without objection.

Defendant's Exhibits B and F were received without objection.

## I. STATEMENT OF FACTS

       Plaintiff seeks exemption of a residential structure located in Astoria, Oregon, that is used

as the church rectory for St. Mary Star of the Sea Catholic Church (St. Mary Church).

According to the testimony of Tran and Molinari, the rectory is occupied by Tran, pastor of the

St. Mary Church.[1]  Tran testified he has been the administrator, and then pastor, of the church for approximately one year and eight months.  Molinari and Tran testified that Tran not only serves as the pastor for St Mary Church, but is also the pastor for St. Francis de Sales mission in Hammond, Oregon (known as "the mission"), and is a priest of a Vietnamese religious community known as Domus Dei, which is a community of priests and persons seeking to become priests.  Molinari testified Tran has been working in the Archdiocese of Portland for approximately five years, and has, for the past two years, been appointed as pastor of St. Mary Church.

Molinari testified that he is employed as the vicar for clergy of the Archdiocese of Portland (Archdiocese), a position to which he was appointed in July 2014.  Molinari testified he is the delegate to the Archbishop of Portland with duties to oversee the assignments of the priests, deacons, and seminarians of the Archdiocese.  Astoria is part of the Archdiocese. Molinari testified that he was ordained in Rome in 1994 after six years of study there, earning a degree in moral theology.  Molinari testified that he was ordained as a priest in Portland in 1995; for 17 of his roughly 20 years of service, Molinari has been a pastor of various parishes in Portland.  Molinari testified that, as the vicar, he serves in a supervisory capacity over Father Tran.

Molinari testified generally about the Catholic Church's policy of rectories.  Molinari testified that there has been Canon Law regarding rectories for centuries.  Canon Law 533 requires priests to reside in a rectory near the church they serve.  (Ptf's Ex 3 at 2.)  According to that law, "[a] pastor is obliged to reside in a rectory *near* the church."  (*Id.*) (Emphasis added). Molinari testified that that requirement is interpreted as requiring a rectory "within the territory

---

[1] Throughout the testimony, the terms "priest" and "pastor" were used interchangeably by Plaintiff's witnesses and legal representative.

of the church parish." Molinari testified that a priest is given an endowment for an entire territory; the rectory enables the priest to faithfully execute his ministry duties within his assigned territory. Molinari testified that the rectory has to be within a "reasonable distance" to the church so the priest can facilitate his ministry, but because the priest has to be available to his parishioners, the rectory must be within a reasonable distance to the parishioners as well.

Molinari next testified in general terms about the intended use of a rectory. He began by explaining that the Church operates under the concept of "sustenance," which means the local parish has to provide for the basic necessities of its priest. The particular requirements within a given archdiocese are usually spelled out in the policies of that archdiocese. The rectory must be within a reasonable distance to the church facilities, and provide a place for the priest to sleep, cook his meals, do his laundry, and have an area for study. The rectory must also have space for an assistant priest in the event there is one, and for seminarians studying for the priesthood who would be given a temporary assignment at a rectory. The rectory must also have space for visiting priests. The rectory is to be used for the purposes of the priest's ministry.

Molinari testified that St. Mary Church Parish has a large geographic area of approximately 360 square miles. That geographic area or territory encompasses a number of small towns in the Astoria area, and parishioners attend either St. Mary Church in Astoria or the mission in Hammond. Molinari explained that the mission is a small established community of Catholics that has its own facilities for worship, religious education, social activities, and service to the community. The mission does not have its own priest and is basically an outpost with a canonical dependence on St. Mary Church Parish. Molinari explained that the mission, which has been in existence for a number of years, provides a religious presence for individuals in that area and is helpful for the elderly and others with transportation challenges. Molinari testified the priests do not marry and devote their time to the needs of their parishioners.

Molinari testified that there have been three rectories for St. Mary Church Parish over the years. According to Molinari, there was the "original" rectory located next to the church, which is now used as office space. There was a second rectory occupied by the previous pastor. Molinari testified that rectory was located "on the block there at the [church property]." Molinari testified that the second rectory was sold when the prior pastor left and Father Tran arrived, but that the transaction occurred before Molinari became the vicar. A third rectory was purchased. That is the subject property at issue in this appeal, which Tran currently occupies.

Molinari testified that the current rectory is approximately 1.5 miles from the church, but that distance is not a material impairment to the use of the rectory as a rectory in accordance with Canon Law and church policy. Molinari testified that he has visited the current rectory and believes it to be adequate to the needs of the priest as well as being in conformity with the code of canon law and policies of the archdiocese; for example, the subject property has a seating area described as a family room/dining room area for receiving guests for parish related activities and fundraisers. Molinari explained on cross examination that church policy calls for a rectory to be designed for those types of activities, but that it is up to each particular pastor to decide whether and how often to hold those activities at the rectory as opposed to the church.

Molinari testified that Tran is also a member of the Domus Dei religious community and that they periodically will send seminarians and other members of the Domus Dei Order to visit Tran at the rectory for consultation and class instruction. Molinari testified that the rectory has a front room for those purposes.

When a seminarian is assigned to a parish, the student sleeps in a guest bedroom at the rectory. Molinari did not testify that a seminarian had been assigned to Tran's parish. He did testify that one of the upstairs guest bedrooms of the subject rectory is available for use by a visiting priest, deacon, or other church official either for overnight stays or for extended visits.

He did not testify as to the number of visiting church officials who stayed at the subject rectory, or the number of nights they may have stayed.

Molinari was asked on cross-examination who chooses a rectory, and he testified that the choice of the rectory is up to the priest, with limited autonomy. Molinari explained that the priest has to consult with the archdiocese before acquiring a rectory.

Defendant asked Molinari on cross-examination why the prior rectory was considered inadequate. Molinari explained that the old rectory was on a hillside and had water runoff problems. Also, there were problems with heating, and, overall, the building was old and in poor repair. Molinari further testified that the old rectory was also small, which made it difficult for the prior pastor to host guests, such as visiting priests, deacons, and seminarians. Tran testified that he was involved in the selection of the new rectory, which was bought because the old rectory had problems with "water, sewer, and heating." Tran further testified that that rectory was in a bad location and had problems with trespassing. Plaintiff purchased the rectory on August 1, 2013. (Def's Ex A at 1-2.)

Tran testified that he studied in New Orleans and Switzerland before returning to the United States to pastor a church in Florida, and then Mobil, Alabama. Tran was then transferred to the Pacific Northwest, and ended up in Astoria.

Tran testified that the subject rectory in Astoria is a two story structure with a kitchen, a dining room, a study room, and a space on the other side of the kitchen area where Tran can visit with guests; it also has a master bedroom upstairs, two guest bedrooms, and a bonus room over the garage where Tran works on all church decorations needed for children to attend school mass. Tran testified on cross-examination that he uses the rectory as his full-time personal residence. Tran sleeps in the master bedroom. Tran testified that one of the guest bedrooms is

/ / /

used by visiting priests. He did not provide any specifics about such visits; how often they occur, how long a visiting priest stays, etc.

Tran testified that he prepares his own meals in the kitchen, and prepares meals for other church related visitors when they stay at the rectory. Tran later described the study as his library, explaining that he has a desk and bookcases in that room. Tran testified that he prepares sermons and homilies at the rectory. Tran testified that it takes him less than five minutes to get from the rectory to the parish by car.

Tran is also a member of a Vietnamese religious community known as Domus Dei that is comprised of priests, monks, and "brothers" who have just entered the religious order. Tran testified that one or two members of the Domus Dei Order generally come to the rectory once each month for a day of religious teaching. Tran testified that Domus Dei is located in Washougal, Washington. Tran testified that those members typically stay at the rectory one to two nights when they come because the Domus Dei Order is located some distance from Astoria, Oregon.[2] Tran testified that, on other occasions, he travels to the Domus Dei Order to meet with them and, when he does so, he is typically gone for approximately one week. During such absences, the archdiocese assigns another priest to attend to the needs of the church; that visiting priest stays at the subject property.

Tran testified that he is the only permanent resident of the rectory. Tran testified on cross-examination that his family members visit approximately once per year, staying two to three nights during those visits. Tran was unable, on cross-examination, to estimate the total number of days his family members stay at the rectory.

Tran testified about vicariate meetings, which are meetings attended by area priests, and run by the vicar. Father Joseph, Sacred Heart Parish, is the vicar for Tran's vicariate meetings.

---

[2] The parties did not present any evidence on the distance between the two cities.

The vicariate meetings are held monthly and scheduled by the vicar. Tran testified that the vicar occasionally schedules the meetings to be held at the subject property. No further specifics were given. Tran testified that the purpose of the meetings is to coordinate various ministries and discuss archdiocese policies and pronouncements.

Tran and Molinari testified that rectories house seminary students, who periodically stay for extended periods of time as part of their religious training during the summer. It was not clear to the court whether Tran has been assigned a seminarian, or whether he has actually had one stay with him at the rectory. Tran testified that when a seminarian is assigned to his parish, the student must be involved in ministry at the parish.

Tran testified that the St. Mary Church Parish consists of approximately 550 families. According to his testimony, Tran has a church office in the building next to the church (the old rectory). That office building has a kitchen and at least one bathroom. However, Tran testified on cross-examination that the kitchen in that building is no longer used. There was no testimony as to whether the kitchen was operable. The church also has business offices, and Tran holds most of his meetings in those offices (e.g., staff meetings, liturgical meetings, and pastoral council meetings). There is also a school on the church property. Tran further testified that he performs church mass services on Saturdays and Sundays, and also holds weddings and funerals at the church. Tran also meets with church parishioners at the church.

Tran testified that, other than infrequent short-term visitations by family members, there are no non-church related activities taking place at the rectory.

On April 1, 2014, Plaintiff filed with Defendant an application for property tax exemption. (Ptf's Ex 1.) Plaintiff's application identified the name of the organization, the physical address and account number for the property Plaintiff sought to have exempted,

/ / /

identified the use of the property as "Religious," and indicated that the property would be used as a "Parish Rectory." (*Id.*)

By letter dated April 7, 2014, Defendant denied Plaintiff's exemption application. (Ptf's Ex 2 at 1-3.) Defendant's denial letter included the following explanation:

> "In the recent past, St. Mary, Star of the Sea Catholic Church leased the Single Family Residence located at 828 14th Street, Astoria, Oregon for use as the Parish Rectory. The leased premises was immediately adjacent to the church property. The Lease contained an Option to Purchase the Leased Premises from the Lessor by May 31, 2014.

> "In August 2013 St. Mary, Star of the Sea Catholic Church purchased the property at 1860 SE 3rd Street in Astoria, the property for which [this] Application for Real Property Exemption is filed. Whereas the leased premises on 14th Street was immediately adjacent to the church property, the property purchased at 1860 SE 3rd Street is approximately 1.5 miles from the church property.

> "* * * * *

> "The property on 14th Street, formerly leased by St. Mary, Star of the Sea Catholic Church, met the stated goal (of proximity) as it was immediately adjacent to the church. The property on SE 3rd Street, being approximately 1.5 miles away from the church, does not appear to meet the stated goal (of proximity) and raises the question as to whether it meets the test of reasonable necessity for the accomplishment of religious objectives of the church."

> "* * * There is no documentation accompanying the Application for Real Property Exemption that would identify the actual use of the property as being consistent with the fulfilling the religious purposes of the church."

(Ptf's Ex 2 at 1-3.)

## II. ANALYSIS

The issue in this case is whether the subject property, a church rectory, qualifies for exemption under ORS 307.140.

A.     *The Statutory Requirements*

ORS 307.140 provides an exemption for "property owned or being purchased by religious organizations * * *[.]" The exemption applies to:

"[a]ll houses of public worship and *other additional buildings* and property *used solely* for administrative, education, literary, benevolent, charitable, entertainment and recreational purposes by religious organizations, the lots on which they are situated, and the pews, slips and furniture therein. However, any part of any house of public worship or other additional buildings or property which is kept or used * * * for any purpose other than those stated in this section shall be assessed and taxed the same as other taxable property."

ORS 307.140(1) (emphasis added).[3]

B.      *Statutory Tests From Case Law*

1.      *Primary Use and Reasonable Necessity – the Two-Prong Test*

In *German Apost. Christ. Church v. Dept. of Rev.* (*German Apost. Christ. Church*), 279 Or 637, 642, 569 P2d 596 (1977), the Oregon Supreme Court construed the text of ORS 307.140, "which exempts for religious organizations 'property used solely for * * * charitable * * * purposes * * *[.]' " The court held that, to qualify for exemption under the statute, "the primary use of the property must advance charitable purposes or goals of the religious organization." *Id*. In so holding, the court declared that the statutory term "used solely" refers to "the primary use of the property." *Id*. at 645.

The Court further stated that "if the charitable use is the advancement of religion, then such use must be primarily for the benefit of the church as well as *reasonably necessary* for the furthering of the religious aims of the church." *Id*. at 642 (emphasis added). The Court ruled that "[u]nder ORS 307.140, if exemption is sought because of religious (and therefore charitable) use, the parsonage must be reasonably necessary for the accomplishment of religious objectives of the church." *Id*. at 643.

Accordingly, as noted by this court in *Washington County Assessor v. West Beaverton Congregation of Jehovah's Witnesses, Inc.* (*Washington County*), 18 OTR 409, 418 (2006), the two requirements for exemption under ORS 307.140 are: 1) "religious use of the property []

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

'primarily for the benefit of the church[;]' " and 2) "that a religious use of property be 'reasonably necessary for the furthering of the religious aims of the church[.]' "

Regarding the second requirement – that "the parsonage must be reasonably necessary for the accomplishment of religious objectives of the church" – the court in *German Apost. Christ. Church* stated that:

> "[t]his may be true if, for example, the continuous presence of a religious leader near the church is needed to attend to the religious needs of the congregation. Such a purpose may be at times be inferred if residence in a parsonage is required as a condition of the ministry. It may also be true if lack of alternative housing compels the church to furnish its own residence in order to attract a minister. "

279 Or at 643.

In *Washington County*, this court appears to have taken that language and, after surveying other court cases, determined there were two requirements for establishing reasonable necessity in "cases involving residences." 18 OTR at 418. The court stated that cases regarding the "second prong," which is "that a religious use of property be 'reasonably necessary for the furthering of the religious aims of the church,' " fall into two categories; one being "those cases involving residences." *Id*. The court went on to explain that two requirements must be met under the second prong in order for a residence to be held exempt.

The first is that "the official living in the residence must be required to live there by either church doctrine or practical necessity." *Id.* at 419 (citations omitted).

The second requirement noted by the court in *Washington County* is that "the proximity of the residence to the house of worship must be necessary to further religious objectives." *Id*. at 419 (citations omitted). "Where the proximity of the residence to the house of worship is not essential, but rather merely beneficial, to the advancement of religious purposes, the residence was held taxable." *Id*. (citations omitted.)

/ / /

2.      *Examination of Actual Use*

The Court in *German Apost. Christ. Church* ruled that "[o]nce such a necessity is shown, the actual use of the parsonage must be examined. If such use is consistent with the claimed necessity the exemption should be allowed." 279 Or at 643. In that regard, the Court continued:

> "[m]oreover, the actual use of the parsonage may be highly relevant in determining its necessity. If the property is substantially used for church functions or rites, entertaining or counseling members of the church and the like, the contention of necessity will be buttressed. Incidental personal benefit to the religious leader of the church will not defeat the exemption, provided that use consistent with a shown necessity is proved."

(*Id*.)

C.      *Additional Considerations*

Under the statute, and depending upon the facts of a particular case, "[i]t is possible that only some parts of an organization's property, or even parts of a single building, are exempt, while other parts are not." *Washington County*, 18 OTR at 415, (citing ORS 307.140(1); *see also Golden Writ of God v. Dept. of Rev.*, 300 Or 479, 483-487, 713 P2d 605 (1986) (holding one parcel exempt and others taxable); *German Apost. Christ. Church*, 279 Or at 644-648 (holding office used for administrating Elder's residence and apartments used by elderly and financially needy church members exempt, but the rest of the residence, including the Elder's sleeping quarters and designated guestrooms for visiting officials, taxable)).

Also, "[t]he requirement of 'used solely in the statute' [ORS 307.140] pertains to the character and not the amount of use." *German Apost. Christ. Church*, 279 Or at 645 (citation omitted). "Infrequent use of property may indicate in part that such utilization is not reasonably necessary for the advancement of church aims." *Id*. Such was the case with regard to a "suite designated as guest rooms for visiting officials" in *German Apost. Christ. Church*, although the problem there was "insufficient evidence of the necessity for th[at] area * * *." *Id*.

Finally, "decisions interpreting ORS 307.130 are of value in the discerning the contours of ORS 307.140." *German Apost. Christ. Church*, 279 Or at 641; see also *Washington County*, 18 OTR at 414.

D.    *Analyzing the Facts of This Case in Light of the Requirements Set Forth Above*

With these rules and guidelines laid out, the court now turns to the key facts in this case as they pertain to the requirements set forth above.

This case involves a church rectory occupied on a full-time basis by Tran, the parish priest. Church law requires that Tran live in the rectory so that he can faithfully execute his duties, facilitating his ministry in its various forms. Church policy requires that the rectory be used for the purposes of the priest's ministry. The rectory is 1.5 miles from St. Mary Church, which is one of two locations where Tran regularly performs his priestly duties. The second location is a church mission located several miles in the opposite direction of St. Mary Church. The archdiocese requires that the rectory be within a reasonable distance to the church facilities, and provide a place for the priests to sleep, cook meals, do laundry, and have an area for study and meditation. The archdiocese prefers, if not requires, that a rectory have more than one bedroom so that there is room for an assistant priest if needed, and that there be a place for visiting priests, deacons, and other church officials to sleep. The rectory must also have sleeping quarters for seminarians, who are generally assigned to a parish for the summer. Priests do not marry and are expected to devote all of their time to the needs of their parishioners.

Is the rectory in this case "reasonably necessary for the accomplishment of religious objectives of the church[?]" *German Apost. Christ. Church*, 279 Or at 643. The two requirements for reasonable necessity in cases involving residences are that "the official living in the residence must be required to live there by either church doctrine or practical necessity[,]

* * * [and] the proximity of the residence to the house of worship must be necessary to further religious objectives." *Washington County*, 18 OTR at 419. The canonical law of the Catholic Church requires that priests live in a rectory "near the church." (Ptf's Ex 3 at 2.) The evidence does not show that the proximity of the rectory to St. Mary Church is necessary to further religious objectives. Although Tran does write sermons and homilies at the rectory, those duties do not require close physical proximity to the church. *See Washington County*, 18 OTR at 421. Tran could prepare those messages anywhere in Astoria, including the church, where he has at least one office. The other uses of the rectory have no direct connection to the church; they certainly do not require a rectory in close proximity to the church. There was generalized testimony about the availability of guest bedrooms for visiting priests, deacons, and seminarians, but no specific testimony or other evidence that such officials have stayed at the subject property and, if so, how many and how often they were there. Assuming such church officials did in fact visit and stay overnight at the rectory, they could have slept in a residence anywhere in Astoria, regardless of its location with respect to the church.

Tran testified he teaches members of the Domus Dei Order at the rectory on a monthly basis. That presents several questions. The Domus Dei Order is in Washougal, Washington, and there is no evidence it is part of the Portland archdiocese territory. If it is not, Plaintiff has not established how their visitations to the rectory in Astoria further the religious aims of St. Mary Church. Tran's duties, according to his supervisor Molinari, are to his parishioners. The relationship between the parishioners and members of Domus Dei is unclear. In any event, Tran could teach the members of the Domus Dei Order at the church or any residence, regardless of its location with respect to the church. There is simply no evidence that the proximity of the rectory to the church is necessary to further the church's religious objectives with regard to Tran's involvement with Domus Dei, or that such involvement directly benefits the parishioners in any

way.  Tran does meet with his parishioners, but those meetings are all scheduled to take place at the church.

The court is mindful of the evidentiary foundation Plaintiff laid through the testimony of Molinari regarding church doctrine relating to rectories.  However, policy is one thing, practice another.  That is why the court must look at actual use.  As the court noted in *Washington County*:

> "[w]ith regard to residences, it is neither the vows of poverty and obedience nor the promise of free housing, nor even substantial religious use, that leads to exemption, but rather *the religious and practical requirement of residence in close proximity to a specific house of worship, combined with actual use primarily for the benefit of the religion* and not the resident.  In close cases, exemptions must be denied."

18 OTR at 422 (citation omitted) (emphasis added).

The reason exemptions are denied in close cases is because of the rule of "strict but reasonable" construction, which "means merely that the statute will be construed reasonably to ascertain legislative intent, but in the case of doubt will be construed against the taxpayer." *German Apost. Christ. Church*, 279 Or at 640, citing *Eman. Luth. Char. Bd. v. Dept. of Rev.*, 263 Or 287, 291, 502 P2d 251, 253 (1972).  "[I]t has long been the rule in Oregon that property is subject to taxation unless specifically exempted." *Christian Life Fellowship, Inc. v. Dept. of Rev.*, 12 OTR 94, 96 (1991) (citing *Methodist Homes, Inc. v. Tax Comm. (Oregon Methodist Homes)*, 226 Or 298, 360 P2d 293 (1961)).  Put another way, "[t]axation is the rule and exemption from taxation is the exception." *Oregon Methodist Homes*, 226 Or at 307 (citations omitted).

While the result in this case might seem harsh, the court finds this case to be more like *German Apost. Christ. Church* and *Washington County* than *Roman Cath. Archdiocese of the Archbishop of Portland in Oregon v. Dept. of Rev. (Roman Cath. Archdiocese)*, 13 OTR 211 (1995), and *Lewis & Clark College v. Comm'n (Lewis & Clark)*, 3 OTR 429 (1969).  The

FINAL DECISION  TC-MD 140316C                                                                                              14

evidence does not establish the level or frequency of use that existed in *Lewis & Clark College*, where the house was used 115 times in a three-year period that included a portion of the tax year at issue, and the number of "guests whose business was directly or indirectly related to the college numbered [between] 670 [and] 1007 * * *." 3 OTR at 432. The nature of the use in this case is unlike that of the priest in *Roman Cath. Archdiocese*, where "the priest use[d] the rectory to study and write sermons, prepare classes and workshops for the parish, conduct individual and marriage counseling, hear confessions, and make and receive phone calls." 13 OTR at 212. The rectory in *Roman Cath. Archdiocese* was also located on or near the church grounds, and was found by the court to be "used by [the] priest and parishioners primarily for the benefit of [the church]." 13 OTR at 214. That is not the case here.

There are other cases where residences belonging to religious organizations have been granted exemptions. For example, in *House of Good Shepherd v. Dept. of Rev.* (*House of Good Shepherd*), 300 Or 340, 710 P2d 778 (1985), the court granted exemption under ORS 307.140 to a convent occupied and used by nuns of the Catholic Church living there communally. However, in that case, the facts were clearly distinguishable. There, "[t]he main living room [wa]s used for meetings and for counseling individuals and families an average of three to four times a week. The chapel [wa]s used for group and private prayer, and mass [wa]s offered approximately once a week. The nuns live[d] on the property as a religious community." *House of Good Shepherd*, 300 Or at 343. The nuns also worked at several charitable and religious locations in the city of Portland. The Oregon Supreme Court rejected the Tax Court's finding that the relevant charitable work of the nuns was performed outside the convent. *Id*. at 343-44. There, the court concluded that "religion may be advanced by communal living in an atmosphere of prayer and adherence to canon law[,]" and such semi-cloistered living in the convent was

/ / /

itself a religious objective because it promoted the advancement of religion, which was " 'charitable' for its own sake[.]" *Id*. at 344, 347.

In *Dasmesh Darbar Sikh Temple v. Marion County Assessor* (*Dasmesh Darbar*), TC-MD 111207D, WL 2708218 (2012), this court granted exemption to a residence occupied by three priests that was located 500 feet from the main entrance to the Temple. Although the priests were generally the only ones occupying the residence, other individuals did stay at the residence for 12 weekends each year for a continuous 48 hour reading of the scriptures, and the residence was also available for overnight lodging of out-of-state residents visiting the Temple. *Id*. at *1. The priests daily opened the Temple at 4 a.m. and kept it open until 10:00 p.m. *Id*. Moreover, while the Temple was officially closed at 10:00 p.m., the priests were " 'on-call after 10:00 p.m.' and expected to be 'there to serve, pray or meditate with anyone who seeks them.' " *Id*. Also, the tradition of the organization for the past 500 years was that the priests were required to live close to the Temple to protect a 1,420 page book of scriptures, which they "treated as a living human being." *Id*. Under those circumstances, the priests were not required to live in the residence, but practical necessity required the continuous presence of the priests to attend to the needs of the church members and their religious practice. *Id*. Accordingly, the court concluded that " 'the religious and practical requirement of [the priests'] residence in close proximity to [the Temple], combined with actual use primarily for the benefit of the religion and not the resident[s],' qualify the subject property for property tax exemption." *Id*. at *3.

Plaintiff argued in closing that all Catholic rectories in the Portland archdiocese are exempt. That may be true, but there is not a specific statutory grant of exemption for Catholic rectories. They are exempt if they meet the applicable legal standards, which is the reason actual use of the property must be examined in each case.

/ / /

### III.  CONCLUSION

The court finds that the subject property, a church rectory, identified as Account 52466, does not qualify for tax exemption for the 2014-15 tax year under ORS 307.140 because the evidence shows the rectory is not reasonably necessary to carry out the religious aims of the church, and is not used consistent with the claimed necessity.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of May 2015.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Dan Robinson on May 5, 2015.  The court filed and entered this document on May 6, 2015.*