IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CIRCLE OF CHILDREN,　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　Plaintiff,　　　　　　　　 )　　TC-MD 150500C
　　　　　　　　　　　　　　　　　　　 )
　　　v.　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
LANE COUNTY ASSESSOR,　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　Defendant.　　　　　　　　 )　　**FINAL DECISION**[1]

Plaintiff appeals Defendant's denial of property tax exemption for property identified as

Accounts 0071744, 1852647, and 1852654 (subject property) for the 2015-16 tax year.  A trial

was held in the Conference Room of the Oregon Tax Court in Salem, Oregon, on July 19, 2016.

Dustin Swanson, Attorney-at-Law, appeared on behalf of Plaintiff.  Blackhorse Shasta (Shasta),

Mike Fisher (Fisher), Joshua Frankel (Frankel), Meghan Machado (Machado), and Tony Archer

(Archer) testified on behalf of Plaintiff.  Sebastian Tapia, Attorney for Lane County, appeared on

behalf of Defendant.  Jane Burgess (Burgess), Miranda Rollins (Rollins), and Lori Halladey

(Halladey) testified on behalf of Defendant.  Plaintiff's Exhibits 1 through 22 and Defendant's

Exhibits A through BB were admitted without objection.  The parties' written closing briefs were

each filed August 2, 2016.

## I.  STATEMENT OF FACTS

Shasta testified that Plaintiff was created in 2009 and he has served as Plaintiff's

Executive Director since that time.  Plaintiff has been tax exempt under Internal Revenue Code

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered January 20, 2017.  The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered.  *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

(IRC) section 501(c)(3) since 2014. (*See* Ptf's Ex 2 at 6.) Plaintiff's Amended and Restated

Articles of Incorporation list its primary purpose as charitable and state that it

> "intends to carry out its charitable purpose by providing free instruction to the general public, and particularly children, on how to live in an earth friendly, sustainable way that reduces our footprint and impact on the planet in order to better the environment for the community at large and ensure that adequate resources are available to future generations."

(*Id.* at 7.) Shasta testified that Plaintiff's activities include permaculture, sustainable forestry,

sustainable building, creative arts and expression, dynamic leadership, and wildlife and plant

education. Plaintiff emphasizes hands-on learning, service, and stewardship. Plaintiff serves

organic, home-made meals to its programs' participants.

Shasta testified that Plaintiff does not charge fees for its services. Plaintiff has asked

attendees at concerts for suggested donations and, for other programs, Plaintiff "invited" four

hours of volunteer service per day. Plaintiff has never denied access to its programs because

someone failed to volunteer. Plaintiff has no paid employees and all of its programs are

volunteer-run and free. As a result, Plaintiff is constantly searching for sponsors and donors.

Machado testified that she has been Plaintiff's administrative manager since mid-2013.

In 2015, Plaintiff's network for electronic news included 2,300 people; as of the date of trial, it

was approximately 2,500 people. Plaintiff communicated with its network in 2015 via event

fliers, newsletters, and Facebook posts. (*See* Ptf's Ex 5 at 40-95.) Machado testified that

Plaintiff also connected with schools and other nonprofit partners through Facebook. Plaintiff

created the "GEM Movement," which is a web-based network that connects youth-designed

service projects to funding and other community resources. (*See id.* at 191, 201.)

/ / /

/ / /

A.      *Subject Property*

The subject property is 61.22 acres "with facilities that constitute the Triangle Lake Conference Center." (Ptf's Ex 2 at 1.) Shasta testified that the subject property is located about 45 minutes northwest of Eugene on Triangle Lake. Plaintiff received the subject property as a donation on or about May 25, 2014. Plaintiff provided a map of the subject property's structures, including a youth volunteer house, three residential houses, an old shop, a pump house, a wood shed, a dining hall, a barn, an office, a nurse station, a lodge, tree-house cabins, rustic cabins, a shower house, a water tank, the Carman Hall, and the Indigo Lodge. (*See* Ptf's Ex 5 at 206; *see also* Ptf's Ex 2 at 1.) Additionally, the subject property includes the "circle garden" and the "food forest." (Ptf's Ex 5 at 206.)

Shasta testified that he is the subject property's caretaker and Plaintiff permits him to live at the subject property in exchange for caretaking. Shasta lives with his family in a single-family residence. Chauce Coxon (Coxon), Garden Manager and Project Assistant, sometimes stayed at the subject property. (*See* Ptf's Ex 5 at 137.)

Shasta testified that when Plaintiff received the subject property it was very overgrown and needed repairs and maintenance. In late March and early April 2015, Plaintiff removed trees that had fallen on structures, repaired structures, cleaned structures, removed brush, and repaired plumbing and electrical systems. (*See* Ptfs' Ex 21 (photos of fallen trees and repairs).) Shasta testified that, in 2015, students who participated in a service learning project at the subject property scrubbed, swept, and powerwashed the treehouse cabins and rustic cabins. Plaintiff repaired plumbing in the shower house and lodge. Plaintiff cleaned Carmen Hall and Indigo Lodge and repaired plumbing and gutters.

/ / /

Shasta testified that the circle garden was built in 2012. In 2015, Plaintiff worked on planning, redesigning, and maintaining it. The students in the service learning project used a chipper to make garden paths with wood collected from the forest. Shasta testified that the "food forest" is a fruit tree orchard with over 100 trees that was planted in 2012 or 2013, with some new trees planted in 2015. In spring 2015, Plaintiff pruned, mulched, and weeded the food forest and created "tree fencing."

Archer testified that he was a volunteer for Plaintiff and has a professional background in construction. Archer learned about Plaintiff in February 2015, when he was in graduate school and responded to Plaintiff's listing for volunteers. As a volunteer, he walked the subject property with Shasta and Machado to document damage and to develop a repair plan. Archer served as a volunteer site manager and, in that capacity, performed repair work and supervised volunteer groups. He began repair work in March 2015 and continued it through November 2015, at which point he needed to find paid employment. He testified that he volunteered for Plaintiff because he thought the subject property was "spectacular" and he is passionate about bringing kids into nature.

Machado provided a detailed timeline developed for the needed repairs to the subject property. (Ptf's Ex 5 at 170-73.) She testified that the timeline was created for a grant application.

Halladey testified that she works as an exemption specialist for Defendant's office. She testified that, in 2012, Plaintiff received property tax exemption for its lease of the subject property based on Defendant's understanding that Plaintiff would clean up and repair the subject property. In 2014, Plaintiff reapplied for exemption and Defendant concluded that Plaintiff had not made sufficient progress — it was still cleaning and preparing to use the subject property.

Halladey visited the subject property in March 2015, viewed about half of it, and then left when the visit became confrontational. Halladey testified that the one garden she saw looked overgrown and full of weeds.

B.      *Plaintiff's Intended Use of the Subject Property, Fundraising Efforts, and Partners*

Plaintiff wrote that it is "developing the [subject property] to become a youth-focused center for sustainable education and holistic health – one in which Oregon-based schools, nonprofit and youth groups will hold field trips, programs, outdoor camps, leadership trainings, events and retreats[.]" (Ptf's Ex 5 at 2.) Plaintiff provided records and documents pertaining to its plans for the subject property, including: financial records regarding Plaintiff's use of the subject property (*id.* at 117); a business plan with budget scenarios, goals, and a sample letter to community partners (*id.* at 174-81); a collection of grant applications and sponsor requests submitted in 2015 (*id.* at 249-310[2]); and a list of Plaintiff's funding sources in 2015 (*id.* at 371-72). Plaintiff's funding sources were grants, monetary donations, and in-kind contributions. (*See id.*) Machado testified that all funds were used at the subject property with the exception of some separately identified funds used for the GEM program. (*See id.*)

Fisher testified that he has 31 years of experience in education and has been the director and principal of the Academy of Arts and Academics (A3) since 2006. He testified that each school year at A3 begins with a three-day outdoor retreat called "Headwaters." Fisher testified that he was looking for a venue for that retreat and a parent introduced him to Shasta in late 2014 or early 2015. He testified that he first visited the subject property in May or June 2015. Fisher testified that he became interested in a partnership with Plaintiff for access to the subject property's gardens and "outdoor lab" where students may conduct field biology.

---

[2] Machado testified that several grant applications were successful. (*See e.g.*, Ptf's Ex 5 at 263-93; *see also* Ptf's Ex 19 at 20-23.) Plaintiff also provided grant applications submitted in 2016. (*See* Ptf's Ex 5 at 333-369.)

Plaintiff provided an unsigned contract between it and A3, identifying a term of July 1, 2015, through June 15, 2017. (Ptf's Ex 5 at 32-39.) The contract provided for A3's use of the subject property for several of its events. (*See id.*) Shasta testified that A3 pledged financial support to Plaintiff because A3 was interested in hosting its outdoor program at the subject property. (*See id.*) In addition to provisions regarding A3's use of the subject property, the contract contemplated that Plaintiff would provide some programming to A3, including "a 60-90 minute presentation on sustainable practices" during the Headwaters event. (*Id.* at 33.) The contract listed pledges by A3 to Plaintiff of $20,000 and $5,000. (*Id.* at 32.) Fisher testified that the $20,000 pledge was intended as a donation and A3 sought funds from its own donors. The $5,000 pledge was the amount A3 budgeted for facility rental. Machado testified that the $5,000 will be paid when the subject property is rented by A3.

Defendant asked Fisher if he considered the School Garden Project of Lane County as an alternative to Plaintiff and the subject property. Fisher responded that he did not because he was not looking for a "content-based" education, but rather an "experiential education." His intention is for A3's teachers and staff to provide the curriculum at the subject property, but he thought that Plaintiff's staff had valuable education to offer.

Frankel testified that he is the Program Director of Partners for Sustainable Schools. He learned about Plaintiff in 2013 or 2014. Frankel volunteered for Plaintiff in 2014 and 2015 in order to help prepare the subject property for use as a camp. His organization has an interest in camp opportunities, as well as experiential and service learning. Frankel served as a "volunteer coordinator" for Plaintiff in 2015; he identified, contacted, trained, and supervised volunteers. He testified that children benefitted from volunteering at the subject property because they came to understand the work involved in a preparing a facility.

Shasta testified that, in 2015, he led numerous site tours of the subject property so that potential partners could view the subject property and learn about Plaintiff's activities. (*See* Ptf's Ex 5 at 124 (listing 18 such partners and potential partners). He testified that schools and green businesses are interested in hosting events at the subject property.

C.      *Plaintiff's Actual Use of the Subject Property*

Plaintiff described its activities at the subject property in 2015 as

> "characterized by heavy administrative duties that were focused principally on GEM and TLC program development and the development of our facilities * * *. Our administration worked with great dedication throughout the year to bring together the volunteers, partners, funding and resources needed to repair and renovate the [subject property] and secure the necessary land use permits for hosting events and overnight camps."

(Ptf's Ex 5 at 1.)

Machado provided a list of Plaintiff's charitable activities at the subject property during 2015: environmental education, holistic health education, community building, youth and family services, recreation activities, meals and accommodation for low income and houseless youth and families, a sober and family-friendly living environment, and partnership with local schools and nonprofit organizations. (Ptf's Ex 5 at 3.)

Shasta testified describing Plaintiff's use of specific parts of the subject property in 2015. Plaintiff used the activity barn to store and cure timber harvested in the forest. It also used the barn for creative arts and expression workshops, as well as a group gathering space. Plaintiff used the dining hall and kitchen to teach nutrition and holistic health, as well as to prepare food. Plaintiff served food that was foraged or grown in its garden as well as food from other sources, including guests visiting the subject property. Plaintiff used the office for administrative tasks. Plaintiff used the nurse's station – a cabin with two bathrooms and bedrooms – as a cabin for

/ / /

volunteers and once as temporary housing for a young family. Machado testified that the Indigo Lodge was used for instructors, musicians, and elderly volunteers. (*See* Ptf's Ex 5 at 330.)

Plaintiff provided a 2015 event log listing all of the events held at the subject property. (Ptf's Ex 5 at 29.) Shasta testified that all of the events listed actually occurred, although none of the multi-day events were overnights. (*See id.*) Of the 20 on-site events listed for 2015, eight were work parties or service events. (*See id.*) Other events included garden parties, "popcorn and documentary" nights, and "campout" events. (*See id.*) Plaintiff provided guest lists and rosters for its events in 2015, reporting between 4 and 28 guests at each event. (*See id.* at 105-113.) The 2015 guest roster lists just over 100 entries for individuals, families, and small groups that visited the subject property for a variety of purposes, including education, shelter due to homelessness, "nature connection," "family services," "community," meals, and work parties. (*See id.*) Plaintiff also provided a list of its 2016 events to date. (*Id.* at 30.) Machado testified that all but two of those events occurred. She testified that one such event was a 2016 spring break nature immersion program in which 8 families participated. (*See* Ptf's Ex 20 at 6-9.)

One of Plaintiff's 2015 events was the "A3 Community Service Days" held August 4-6, 2015. (Ptf's Ex 5 at 29.) Shasta testified that two separate groups of 10 to 15 students visited the subject property, walked the land, and learned about edible plants. The students also performed service at the subject property and built a Mandala wheel. Fisher testified that the primary objective for A3 at the community service days was to prepare the subject property for a larger group visit. A3 students and staff made at least four trips to the subject property in 2015. Fisher testified that students benefitted from their activities at the subject property based on both the service and the community involvement components. No students were required to pay a fee for activities at the subject property. Fisher testified that A3 had been planning to launch its

permaculture program at the subject property on Earth Day 2016, but the event was cancelled due to bad weather.  (*See* Ptf's Exs 6, 8.)

Plaintiff provided 18 letters from program participants, volunteers, and guests at the subject property describing their experiences with Plaintiff and at the subject property.  (Ptf's Ex 5 at 5-27.)  The letters expressed appreciation for Plaintiff's services and acknowledgement of education received from Plaintiff.  (*See id.*)  Many described specific volunteer work performed at the subject property and some described the purpose of that work as preparing the subject property for future use.  (*See, e.g., id.* at 14.)

D.      *Land Use Issues Impacting the Subject Property*

Burgess testified that she is a Compliance Officer for Lane County Land and Building Codes and was involved with code compliance with both the subject property's former owner and with Plaintiff.  In the past, a nonconforming use permit had been approved for a church camp at the subject property, but following a one-year lapse in the nonconforming use, the approval was lost.  The subject property was shuttered in 2008 and reverted to farm and forest uses.  (*See* Def's Ex O at 2.)

According to a Land Use Compatibility Statement (LUCS) dated October 7, 2015, Lane County Compliance sent a Request for Voluntary Compliance letter to Plaintiff on August 20, 2013, notifying Plaintiff of "the discontinuance of a nonconforming use" and asking Plaintiff to "voluntarily comply with the Lane Code by submitting a land use application to request sanction for the continued use of the property * * * or to discontinue the use of the property."  (Def's Ex O at 2.)  Thereafter, on March 14, 2014, Lane County Compliance issued an Order to Comply. (*Id.*; *see also* Ptf's Ex 17.)  Shasta testified that the Order prohibits camp conferences and retreats at the subject property.  Plaintiff has complied with the Order to Comply and has never been

fined by the County. Burgess testified that she has never told Plaintiff that it was in violation of the Order to Comply or imposed any fines on Plaintiff. She has been very specific about what Plaintiff can and cannot do on the subject property.

The LUCS provided the following analysis regarding use of the subject property:

"It certainly appears that the land use approvals in Lane County files * * * were used to authorize the building permits that were issued to construct the camp and conference center, and that as recently as 2008, Lane County believed the site was operating as a legal non-conforming use. What is less clear is the time frames associated with the operation of the camp and conference center and if there was a lapse of the use for greater than one year. A separate land use process would need to be initiated in order to establish the legality of the current use of the property as a camp and conference center."

(Def's Ex O at 2.) Shasta testified that Plaintiff hired counsel in summer 2015 to submit an application to use the subject property for camps and conferences. That permit application process is ongoing. Shasta testified that he has met with Burgess and other representatives of Lane County – most recently in January 2016 – regarding Plaintiff's ongoing effort to receive permits to use the subject property for camps and conferences. He testified that, at that meeting, he discussed plans to launch a permaculture garden at the subject property with A3 on Earth Day 2016 and was told that use was permitted under the zone. Shasta testified that he was also told that use of facilities incidental to farm and forestry programs was permitted.

E.      *Comparable Programs to Plaintiff*

Rollins testified that she is a legal secretary for Lane County Counsel. She testified that she searched for similar programs to Plaintiff that offered gardening, permaculture, and sustainable development. The Central Oregon Forage Seminar is a free, one-day seminar. (*See* Def's Ex C.) Willamalane Park and Recreation District and Oregon State University Extension Service Master Gardeners provide a free one-hour gardening class. (*See* Def's Ex J.) The

/ / /

School Garden Project helps Lane County schools create, sustain, and use onsite gardens. (*See* Def's Ex K.) It provides services at seven to nine percent of its actual operating costs. (*See id.* at 5.)

## II. ANALYSIS

The issue before the court is whether the subject property qualifies for property tax exemption for the 2015-16 tax year under ORS 307.130.[3]

ORS 307.130(2) exempts from taxation certain real or personal property, or portion thereof, owned or being purchased by incorporated charitable institutions. In order to be a "charitable institution" under ORS 307.130(2), "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991). Additionally, the property must be "actually and exclusively occupied or used in the * * * charitable * * * work carried on by such institutions." ORS 307.130(2)(a).

"Exemption is an exception to the general rule that all property is taxable." *Evergreen Aviation & Space Museum v. Yamhill County Assessor*, TC 5181, 5182, WL 1559051 at *2 (2016), citing *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 426-27, 723 P2d 320 (1986). "Oregon follows the rule that 'tax exemption statutes should be strictly construed in favor of the state and against the taxpayer.'" *North Harbour Corp. v. Dept. of Rev.*, 16 OTR 91, 94 (2002), quoting *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 27, 343 P2d 893 (1959). "In cases where the question is not legislative intent but whether a property fits the statute, even in close cases, exemption will be denied." *Evergreen Aviation*, WL 1559051 at *2 (2016), citing

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

*Washington Co. Assessor II v. Jehovah's Witnesses*, 18 OTR 409, 422 (2006). Plaintiff bears the ultimate burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

A.      *Whether Plaintiff was a Charitable Institution under ORS 307.130(2)*

As noted above, in order to qualify as a "charitable institution" under ORS 307.130(2), an organization must satisfy the three requirements of the *SW Oregon* test: "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." 312 Or at 89. Of the three requirements, the court understands only the third – gift or giving – to be at issue. (*See* Def's Closing Arg at 6.)

Whether an organization's performance involves gift or giving is considered from the perspective of "the recipient of the charitable giving." *SW Oregon*, 301 Or at 91. The question is "not whether [the organization] gains some kind of remuneration from some source, but whether, *so far as the recipient is concerned,* the [organization's] services are given to the recipients with strings attached." *Id.* at 91-92 (emphasis in original); *see also Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229, 242-43 (2013) ("[t]he question is whether individuals other than those who own or operate the institution receive a benefit without any expectation of reciprocity from the recipient").) When determining whether an organization's operations involve "gift or giving," Oregon courts consider a non-exhaustive list of factors, including

> "(1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(2) Whether patients or patrons receive the same treatment irrespective of their ability to pay;

> "(3) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed; and

> "(4) Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent."

*Serenity Lane,* 21 OTR at 236, citing *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 310, 360 P2d 293 (1961) and OAR 150-307.0120-(4)(d)(C)[4] (internal quotation marks omitted).

Plaintiff contends that its performance involves gift or giving based on its "free hands-on, experiential learning and training programs [that] teach farming and sustainable forestry and living practices to children and youth, without expectation of compensation or remuneration." (Ptf's Closing Statement at 3.) Plaintiff asserts that, "at most" it "has sometimes requested a small in-kind contribution of food in an attempt to directly offset its operational costs." (*Id.*) Defendant disagrees that Plaintiff's performance involves "gift and giving":

> "In most teaching organizations, a child might expect to go home with the plant they started, a project they made, etc. This is not the case at Circle of Children. Kids work or watch people work and Plaintiff claims the various aspects the kids learn in the process is Plaintiff's gift/giving activity."

(Def's Closing Arg at 6.)

With the exception of the anticipated $5,000 facility rental fee that A3 agreed to pay for its Headwaters event, the evidence presented demonstrates that Plaintiff did not charge any fees for its program and services. Plaintiff requested program participants and guests to bring food to share and to donate their time through volunteer work. This court has previously said that "[p]ermitting the poor to work off the price of admission may be good philosophy, but it is not charity." *Oregon Country Fair v. Dept. of Rev.*, 10 OTR 200, 206 (1986). However, that was in

---

[4] The court's references to the Oregon Administrative Rules (OAR) are to the 2016 version, which was renumbered as of September 1, 2016. Because the parties referenced the former numbering of the OAR in each's brief, the court has updated such references to reflect the current numbering.

the context of fee-based services. Shasta testified that Plaintiff never denied anyone access to its programs based on failure to provide the requested volunteer services and no evidence was presented to rebut that testimony. The court is persuaded that Plaintiff satisfies the four factors identified in OAR 150-307.0120-(4)(d)(C).

The parties dispute whether the volunteer services provided to Plaintiff support a finding that Plaintiff is a charitable institution. That issue became somewhat muddled at trial based on the testimony describing the benefits "service learning" and "experiential education." To be clear, the court is *not* of the view that Plaintiff was engaged in "gift or giving" when it organized work parties and other volunteer opportunities for its own benefit. Rather, the willingness of individuals to provide volunteer services to Plaintiff may signify that those individuals view Plaintiff as a charitable institution worthy of donated services. Plaintiff correctly points out that, under OAR 150-307.0120-(4)(d)(D), "[t]he fact that individuals provide volunteer labor to assist the organization in performing its activities may indicate that the organization is charitable." (Ptf's Closing Statement at 2-3.)

Defendant cited *Samaritan Village* in support of its determination that Plaintiff is not a charitable institution. (Def's Closing Arg at 7.) In *Samaritan Village* the plaintiff operated a senior living facility at which the residents paid rent and also provided volunteer services to the plaintiff. WL 25846514 at *1. The court agreed with the defendant "that volunteer services provided by the residents for their own benefit is not charity." *Id.* at *5 (citing the rifle club example in OAR 150–307.0120(3)(b).) Ultimately, the court in *Samaritan Village* found that the plaintiff's performance involved gift or giving based on the facts that the plaintiff charged rents 40 percent below market; outside individuals and groups provided donations and volunteer work to the plaintiff; and "outside groups routinely use[d] the facility free of charge." *Id.* at *7. The

court noted that the donations made to the plaintiff "suggest a public determination that [the plaintiff] is charitable." *Id.*

Here, the evidence presented indicates that numerous individuals and organizations have made donations to Plaintiff and provided volunteer services to Plaintiff. The motivations of those various groups and individuals are mixed. The testimony of Fisher and Frankel as well as some of the letters from supporters suggested that some volunteers were motivated primarily to restore the subject property and use it in the future for camps and retreats. Others, including Archer, volunteered without any apparent personal benefit. Similarly, Plaintiff received grants and donations because of its charitable mission and work. Ultimately, the court is persuaded that Plaintiff's activities involved gift or giving and that Plaintiff was regarded as a charitable institution by its participants, supporters, and donors.

B.      *Whether Plaintiff Actually and Exclusively Used the Subject Property*

In order for a charitable institution to receive property tax exemption, the property must be "actually and exclusively occupied or used" in its charitable work. ORS 307.130(2)(a). "In construing the phrase 'exclusively used,' the Oregon Supreme Court has held that it refers to the primary, as opposed to the incidental use of the property." *Mercy Medical Center, Inc. v. Dept. of Rev.*, 12 OTR 305, 308 (1992), citing *Multnomah School of the Bible v. Multnomah County*, 218 Or 19, 29, 343 P2d 893 (1959). In addition, this court has said that the charitable organization's use of the property "must 'substantially contribute' to achieving the organization's purposes." *Id.*

> "The test applied by the courts is not a precise concept. It has even been expressed in the alternative: 'To qualify for a charitable exemption under ORS 307.130, the taxpayer must show first that 'the activity undertaken on the property *substantially contributes* to the furtherance of the charity's goals.' [O]r, stated another way, that such a use 'is incidental to and *reasonably necessary* for

/ / /

the accomplishment and fulfillment of the generally recognized functions of such a charitable institution.' "

*Id.* at 308 n2, citing *German Apostolic Christ. Church v. Dept. of Rev.*, 279 Or 637, 641, 569 P2d 596 (1977) (citations omitted) (emphasis in original). "Infrequent use of property may indicate in part that such utilization is not reasonably necessary for the advancement of church aims." *German Apostolic Christian Church*, 279 Or at 645. "In summary, the court must determine what role the use of the property plays in the institution's accomplishment of its charitable purposes. This determination must focus on the relationship of the activity or use to the institution's exempt purposes." *Mercy Medical*, 12 OTR at 309. In making that determination, the court should be "hesitant to substitute [its] judgment for that of the exempt organization." *Id.*

Defendant criticized Plaintiff's failure to present evidence of the value of its services. (*See* Def's Closing Arg at 1.) Defendant sought to provide that evidence by presenting the fees charged by organizations offering services similar to Plaintiff. It is unclear to the court how such evidence should be considered by the court in its analysis. At trial, Defendant suggested that the court must "assign a monetary value to the charity [Plaintiff] provides and determine whether that value is greater than the monetary value of the property tax exemption." (Ptf's Closing Statement at 4.) The court is unaware of any legal authority requiring such a comparison. It may be that Defendant was seeking to challenge whether the subject property – a 61.22-acre parcel – was truly *necessary* for the charitable use that Plaintiff made of the subject property.

The evidence demonstrates that Plaintiff utilized parts of the subject property for its charitable activities, including the barn, dining hall, kitchen, and office. Plaintiff maintains that it used the circle garden in 2015, but Halladey testified that the garden was overgrown and full of weeds. Plaintiff did not use other parts of the subject property for its charitable activities, including the tree-house cabins, the rustic cabins, and the shower house. Plaintiff was unable to

use the entire subject property for two reasons: (1) some parts of the subject property were in disrepair or damaged by fallen trees; and (2) Plaintiff may not have been permitted to use the structures for a camp or retreat program due to zoning and permitting issues.

Plaintiff should be allowed a property tax exemption based on its charitable use of at least part of the subject property. The question becomes whether Plaintiff should receive property tax exemption for other parts of the subject property based on its efforts to prepare the subject property for future charitable use by repairing damaged structures and complying with applicable land use regulations.

1.     *Whether Plaintiff was preparing to use the subject property for exempt purposes*

In *Willamette Univ. v. State Tax Com.*, 245 Or 342, 349, 422 P2d 260 (1966), the Oregon Supreme Court held that property is "actually occupied and used" by an organization even when "the premises are then being prepared to carry out the purposes of the exempt charity * * *." It granted property tax exemption for several parcels upon which "student housing units were under construction." *Id.* at 344. Following that precedent, this court has granted property tax exemption to a church that could not use its property as a church during the relevant time period because the applicable zoning ordinances required the church to apply for and obtain a conditional use permit. *Reorganized Church of Jesus Christ of Latter Day Saints v. Dept. of Rev.*, 6 OTR 510, 511-512 (1976). The court reasoned that the church

> "sought from the time of acquisition to use the subject property as fully as it
> legally could and, as a matter of fact, did make some use of it, and, eventually, the
> hindrances to its use, consisting solely of temporary governmental restrictions
> pending governmental decisions, were ultimately eliminated by favorable
> governmental approval of its petitions."

*Id.* at 518-519.

/ / /

Here, Plaintiff made use of the subject property in accordance with what was legally permissible and in compliance with the County's Order. Plaintiff presented evidence of its progress toward using the subject property as a camp and retreat center, including its work to repair damaged structures, its fundraising and grant writing, and its ongoing efforts to obtain necessary land use approval to use the subject property as a camp and retreat. The court is persuaded that Plaintiff's activities aimed at preparing the subject property for use as a camp and retreat were sufficient to qualify as actual and exclusive use of the subject property under the standards set out in *Willamette University* and *Reorganized Church*.

Defendant raised an issue concerning the pace of Plaintiff's progress. Defendant had previously granted Plaintiff exemption when Plaintiff leased the subject property, but denied Plaintiff's exemption for the 2015-16 tax year because Plaintiff had shown insufficient progress. In *Society of St. Vincent DePaul of Portland, Oregon, Inc. v. Dept. of Rev.*, 272 Or 360, 363-64, 537 P2d 69 (1975), the Oregon Supreme Court allowed property tax exemption to an organization seeking to put its building into use, even though the organization's "progress in developing its use of the property was necessarily slow because of its lack of finances." *Id.* at 364. Here, Plaintiff presented evidence including financial statements and grant applications demonstrating that it was working with limited financial resources while actively seeking to raise additional funds. Plaintiff completed its repair work on the subject property with the help of volunteer labor. Based on the evidence presented for the 2015-16 tax year, the court is persuaded that Plaintiff made sufficient progress toward its goal of using the subject property as a camp and retreat.

/ / /

/ / /

2.        *Whether the staff residences are exempt from property taxation*

Defendant asserted that the subject property was used for the private benefit of Shasta, Machado, and Coxon, insofar as they each lived in houses located on the subject property. (*See* Def's Closing Arg at 7.) Plaintiff maintains that "the remoteness of the [subject] property, when combined with its history of immediate needs such as burst plumbing and fallen trees," necessitated that Plaintiff's staff occupy two residential buildings onsite. (Ptf's Closing Arg at 6.) Additionally, Plaintiff argued that "the roads must be kept clear, the gardens need continuous attention, the forests must be maintained, and the buildings must be preserved. These continuous needs and the history of and potential for emergencies require staff to be physically present on the property as much as is practicable." (*Id.* at 7.)

Courts in a few cases have considered whether a caretaker's residence is entitled to property tax exemption. In *Mult. School of Bible*, the Oregon Supreme Court granted property tax exemption for the on-campus residences of the "building superintendent" and the "cafeteria supervisor," finding that those employees performed "essential functions" that necessitated their residence on the property, a school with student dormitories. 218 Or at 22, 37.

In *Archdiocese of Portland in Oregon v. Dept. of Rev.*, 14 OTR 264, 265 (1998), the Oregon Tax Court denied exemption for a caretaker's cabin at a summer youth camp under both ORS 307.140 and ORS 307.130. The caretaker's cabin was not exempt under ORS 307.140 because it was not used "solely" for the exempt purpose. *Id.* at 268. The cabin was not exempt under ORS 307.130 based on the standard articulated in *Mult. School of Bible*. *Id.* at 269. The court explained its ruling as follows:

> "Plaintiff contends that a caretaker's cabin is necessary to accomplish its goals. By protecting the camp, the caretaker substantially contributes to the exempt organization's purposes or objectives. * * * Plaintiff may be correct, but the facts presented to the court are insufficient to support such a finding. There are too

many unanswered questions for the court to conclude that a caretaker residence is 'reasonably necessary' to the operation of the camp. For example, are there alternative means of securing protection of the camp? Are other residential accommodations reasonably available nearby? How difficult or expensive would it be to make other arrangements to perform the functions now done by the

caretaker? To be exempt, the facts must indicate that the cabin is primarily for the benefit of the organization rather than for the employee."

*Id.*

Here, the facts presented are closer to the facts in *Archdiocese of Portland*; accordingly, they are insufficient to support a finding that the onsite staff residences were reasonably necessary for the charitable activities conducted by Plaintiff at the subject property. Plaintiff claims onsite staff residences are necessary for the maintenance and preservation of the subject property. The court is not persuaded that Plaintiff's staff must live onsite in order to repair and maintain the subject property and that no reasonable alternatives are available. There might be reason to find that Plaintiff's staff must live onsite if the subject property were used as a camp or retreat for guests that stayed overnight, but that was not the case during the 2015-16 tax year. The court finds that the residences occupied by Plaintiff's staff were not reasonably necessary to Plaintiff's charitable use of the subject property; therefore, Plaintiff's staff residences are not entitled to property tax exemption.

## III. CONCLUSION

After careful consideration, the court concludes that Plaintiff was a "charitable institution" within the meaning of ORS 307.130(2) for the 2015-16 tax year. The court further concludes that the subject property is exempt from property taxation for the 2015-16 tax year, with the exception of the two residences used by Plaintiff's staff. Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part.

Dated this ___ day of February 2017.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on February 8, 2017.*